FILED
2011 Mar-23 PM 09:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

**EQUIFAX**

.eral Trade Commiss' :
RECEIVED

APR 1 6 2004

Office o.
Commissioner Leary

**Hand Deliver**

Thomas F. Chapman
Chairman and
Chief Executive Officer

Equifax Inc.
1550 Peachtree Street, N.W.
Atlanta, Georgia 30309
(404) 885-8422
~~404~~ 885-8766

FEDERAL TRADE COMMISSION
RECEIVED DOCUMENTS

APR 22 2004

SECRETARY

April 16, 2004

Commissioner Thomas P. Leary
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC   20580

Dear Commissioner Leary:

I am the Chairman and Chief Executive Officer of Equifax, the nation's oldest, largest and only publicly traded consumer reporting agency.

Today, we have submitted to the Commission our formal comments on the staff's proposed rule regarding free annual file disclosure and the establishment of the "centralized source" (Proposed Rule) under the Fair and Accurate Credit Transactions Act of 2003 (FACTA). We will also submit timely formal comments on the Commission's Interim Final Rule on Circumvention (Interim Circumvention Rule). I am writing with deep concern to each of the members of the Commission for three reasons.

First, each of you should know that adoption of the Proposed Rule, as drafted, will imperil the integrity and the effectiveness of the national credit reporting system. Our submission concerning the Proposed Rule expresses our surprise and profound disappointment that the proposal fails, in so many respects, to implement both the letter and the spirit of FACTA, to assure the protection of consumers and of our credit economy. As drafted, the Proposed Rule:

- fails to provide any sufficient transition period to permit our industry to build an infrastructure to deliver reports and level surges in demand volume properly;
- fails to stagger consumer eligibility to assure that, at any one time, the entire population cannot request a free  report;
- fails to recognize and protect against the threat that the volume of unregulated demand for free reports will overwhelm our capacity to serve consumers on any reasonable basis:
- fails to recognize in any way the impact of free reports on our ability to serve consumer inquiries and need concerning those reports and others;
- fails to recognize the small size of this industry and the absence of resources available to meet the unreasonable demands for capacity levels sought to be imposed:

Commissioner Thomas P. Leary
Page 2
April 16, 2004

- fails to recognize the significant burdens that will be placed on credit grantors and protect consumers from the potentially catastrophic effects of those demands on the ability to obtain credit effectively and efficiently;
- fails to prevent and, indeed exacerbates, the risk of overwhelming class action liability; and
- fails to compel all participants in the national credit reporting system to also share in the implementation of the national free report requirement; instead, contrary to the letter and spirit of FACTA, unfairly requiring nationwide consumer reporting agencies to purchase consumer reports from other associated consumer reporting agencies for free distribution to consumers.

Second, I believe that is important for you to know that the Interim Circumvention Rule, as drafted, has serious implications for the ability of consumer reporting agencies, especially a public company as Equifax, to make future business decisions with the flexibility required in a fast moving marketplace and in the interests of its shareholders. It is imperative that the final circumvention rule not impact legitimate business decisions in a competitive free market. It is also imperative that the final circumvention rule provide clear standards by which a consumer reporting agency can determine whether legitimate business decisions regarding corporate or operational matters that are fully compliant with other laws, such as the anti-trust laws or the internal revenue code, are in violation of this rule. Unfortunately, the interim rule does not provide standards or definitions. Its vagueness does not provide the guidance needed for Equifax to be able to determine whether actions are or are not in compliance with the rule.

Third, and critically, I write to ask that, during your consideration of revisions to the Proposed Rule, the Interim Circumvention Rule, and the submitted comments, I be given the opportunity to meet with each of you. The stakes here are of great significance to Equifax and they warrant a face-to-face discussion of the serious concerns highlighted in this letter and discussed in detail by our submissions to the Commission.

At Equifax, we are proud that, for over a century, we have spearheaded the development of a credit reporting system that helps to provide Americans with the world's most fair, most convenient, most reliable and most economic consumer credit. I am hopeful that, upon consideration, the Commission will revise the Proposed Rule so that the final regulation does not cause significant harm to the national credit reporting system.

I look forward to meeting with each of you at your earliest convenience.

Sincerely,

April 16, 2004

**VIA COURIER**

Federal Trade Commission
Office of the Secretary
Room 159-H
600 Pennsylvania Ave., NW
Washington, D.C.  20580

**Re: FACTA Free File Disclosures Proposed Rule, Matter No. R 411005**

## I. INTRODUCTION

Equifax Information Services LLC is a consumer reporting agency that furnishes

consumer reports to its financial institution customers, other businesses that have a

permissible purpose as defined in the FCRA, and consumers.  We are a subsidiary of

Equifax Inc., a 105-year-old company and member of the Standard & Poor's (S&P)

500® Index, a global leader in turning information into intelligence, serving customers

across a wide range of industries and markets, including financial services, retail,

telecommunications, utilities, mortgage, brokerage, insurance, automotive, healthcare,

direct marketing and transportation.[1]

Equifax Information Services LLC (Equifax) appreciates having had the

opportunity to meet with Commission staff as they formulated the Proposed Rule.  We

also appreciate the opportunity to submit formal written comments in the above

---

[1] Please note that the reference to Equifax Inc in footnote 13 of the Commission's overview of the
Proposed Rule is incorrect, as Equifax Inc. is not a consumer reporting agency.

1

referenced matter.  We understand the difficult task and challenging time frame

confronted by the Federal Trade Commission (Commission) and its staff with respect to

its proposed Free Annual File Disclosure Rule (Proposed Rule).  As described more fully

below, however, we believe that the Proposed Rule fails to properly implement the Fair

and Accurate Credit Transactions Act of 2003, Pub. L. 108-159 (FACTA) with respect to

key elements of the new centralized source.  This failure, if not corrected, would pose a

significant risk to consumers, consumer reporting agencies that will participate in the

centralized source, data furnishers, and the credit reporting system as a whole.


## II. OVERVIEW


This submission urges the Commission to make substantive and important

changes to the Proposed Rule.  FACTA requires the Commission to adopt a rule which

accomplishes:  1) the implementation of the free annual disclosure requirement; 2)

through the creation of the centralized source system; 3) that builds capacity in the short

term; and 4) leads to a smoothly-functioning, long-term system; 5) able to handle routine

consumer demand; and that 6) allows § 603(p) agencies and data furnishers to meet all of

their other FCRA and FACTA obligations.  Equifax appreciates the difficulty of this

challenge.  Make no mistake, however, the Proposed Rule, as currently drafted, fails to

meet this challenge.


The credit reporting system is similar to a three-legged stool.  Consumers, data

furnishers, and consumer reporting agencies, each represent a leg of the stool.  When all

three legs of a stool function properly, the weight on each leg is properly balanced and the stool is stable.  Similarly, when the rights and responsibilities of the three components of the credit reporting system are in sync and properly balanced, the credit reporting system is stable and can meet the needs and interests of all participants.  However, when one of the legs of a stool is out of proportion, greater pressure is put on the other legs.  The stool looses its stability, and if not corrected, it loses its ability to function at all.

In FACTA, Congress determined that the right of consumers to receive a free annual file disclosure was desirable.  Importantly, however, Congress recognized the potentially overwhelming burdens that the new free annual report requirement poses for the § 603(p) agencies and for data furnishers.  Congress also recognized the risks this additional burden presents for the credit reporting system and our national credit economy.

Congress addressed its concerns that free annual disclosures not upset the balance and stability of the credit reporting system in FACTA § 211(d)(2).  This section of the law requires the Commission to consider: 1) the "significant demands" the new requirement poses for the § 603(p) agencies and 2) "appropriate means to *ensure*" that the agencies can satisfactorily meet the added demands placed on them, including evaluating systems of staggering the availability of free reports; and 3) consumer ease in contacting the centralized source to request free annual disclosures.

3

Remarkably and amazingly, the Proposed Rule effectively ignores the first two components of this congressional mandate. Instead, the Commission focuses almost solely on the ease by which consumers can make their requests. The Proposed Rule's utter failure to effectively stagger and manage the manner in which consumers become eligible for the new, free, curiosity disclosure poses a grave risk to the stability of the credit reporting system.

### The impact on consumers

At the outset, it must be recognized that rushing the process for implementing this new consumer right will not resound to the ultimate benefit of consumers. This new right for free annual disclosure will be available to all consumers forever. It does not go away. Accordingly, there is no fundamental imperative that this free, curiosity-driven annual disclosure be immediately available to all consumers, as quickly as possible. A gradual, deliberate, rational implementation of this new consumer right serves the long-term best interests of consumers, § 603(p) agencies, and data furnishers. Deliberate and rational implementation does not deprive consumers of access to their reports; consumers will continue to be able to obtain free annual disclosures of their credit files in the transition periods, including free file disclosures for consumers with the greatest need for them, such as a result of an adverse action notice or in connection with identity theft.

Imposing an implementation process that the credit reporting system cannot achieve, as the Proposed Rules does, will foster consumer discontent and disillusionment.

4

Further, to the extent that a hasty and ill-conceived implementation of the right for free annual disclosure occurs, breakdowns in the credit reporting system would have adverse effects on the completion of actual consumer transactions and the efforts to combat identity theft.

The burden of § 603(p) agencies' responding to and managing consumer inquiries, modification requests, and reinvestigation requests will increase significantly as a result of the consumer right to free annual disclosure. This increased burden could well overwhelm the ability of these § 603(p) agencies to: a) service consumer requests for free annual disclosure, and simultaneously b) assist consumers who need assistance by virtue of their participation in an actual consumer transaction, and c) work with consumers who have been victims of identity or fear that they could become victims.

The impact on the § 603(p) consumer reporting agencies

The burdens of the new free annual file disclosure requirement fall on both the § 603(p) agencies and data furnishers. In enacting FACTA, the Congress recognized that it was placing a heavy burden on the § 603(p) agencies.

5

As Senator Bennett (R-UT) noted during Senate hearings held on July 31, 2003 "Addressing Measures to Enhance the Operation of the Fair Credit Reporting Act":

> We are asking the credit reporting agencies to give away their product. . . that which they earn their money on. As long as they are giving it to a relatively small group, they can handle that, but as we drive towards [credit reporting agencies] giving away their product to more and more and more people, it raises all kinds of questions about who's going to pay for it eventually. . . Have you given any thought to the cost implications?"

The initial burden to the § 603(p) agencies is, of course, in connection with accepting consumer requests for free annual disclosure. This includes the cost of building, maintaining, and operating the centralized source, verifying the consumer's identity, and communicating the free annual disclosure. However, the most significant burden for the § 603(p) agencies, data furnishers, and the credit reporting system as a whole arises after consumers receive their free annual disclosure. This burden consists of the human and technological resources needed to respond to consumer inquiries about their reports, processing consumer requests for various types of modifications to their files, and handling requests for reinvestigations.

<u>The impact on data furnishers and the credit economy</u>

The reinvestigation requests consumers make to § 603(p) agencies will generate substantial increased and, potentially, unprecedented work for data furnishers. Also, under FACTA, consumers can request reinvestigation of information in their credit files directly with the data furnisher. Data furnishers will be called upon to handle these increased reinvestigations in addition to their other new obligations under FACTA. If the

free annual report is rolled out too quickly, the data furnishers are likely to be so overwhelmed that they cannot review and respond to these reinvestigation requests in a timely fashion. This will result in the mandatory deletion of information in credit files. In many cases, the completeness and accuracy of credit reports will be degraded, as credit repair clinics take advantage of overburdened data furnishers.

Overwhelming levels of reinvestigation requests could chill data furnishers' willingness to continue to voluntarily report information to the nationwide consumer reporting agencies, resulting in further erosion of the quality of consumer credit files. Further, such floods of requests would encourage data furnishers to develop strategies for escaping the reinvestigation workload.

If the ability of the § 603(p) agencies and the data furnishers to handle consumer requests for reinvestigations is overwhelmed the quality and quantity of credit reports will be degraded. This result poses grave and significant risks to the credit economy and the safety and soundness of the financial institutions that rely on credit reports in consumer transactions.

**B. The Proposed Rule Can Be Revised to Meet the Challenge**

The Commission's final rule must reflect the potential for these burdens and risks, just as FACTA does, and take steps to ensure that they do not happen. As discussed in greater detail below, the final rule should:

7

- Exert the Commission's authority over "substantially nationwide" consumer reporting agencies to maximize consumer access to free annual disclosures, and remove the illusion this can be accomplished by requiring § 603(p) agencies to disclose the credit files of "associated consumer reporting agencies";

- Implement a rational, deliberate, and appropriate two-year transitional system for the centralized source, allowing participating consumer reporting agencies to gradually build capacity;

- Stagger consumer eligibility to obtain free annual disclosures both during the transition, as well as the permanent system;

- Create a reliable capacity safe harbor for the entire transition period set at 231% of current consumer demand among the segment of the population then eligible to request the free annual file disclosure;

- In both the transition and permanent systems, include workable and appropriate safe harbors for high request volumes and extraordinary request volumes with thresholds of 115% and 125%, respectively;

- Create a safe harbor for the § 603(p) agencies in the event that their ability to provide a free curiosity report is interrupted by Acts of God or other events outside their control based on the principle of *"force majeure"*; and

- Limit the significant risks to the § 603(p) agencies from private enforcement, including class action enforcement, of the free report and centralized source requirements. A predicate for bringing an action should be notice and an opportunity to cure any potential violations. The final rule should also include appropriate safe harbors to shield § 603(p) agencies from liability.

There are other aspects of the Proposed Rule that are also need to be revised in order for the final rule to be effective and balanced. These will also be addressed below.

## III. DETAILED COMMENTS

### A. Associated Consumer Reporting Agencies—Proposed Rule § 610.1(b)(2) and "Substantially Nationwide" Consumer Reporting Agencies

The Proposed Rule's scheme for disclosure of associated consumer reporting agency files is seriously flawed and unworkable.

Section 610.1(b)(2) of the Proposed Rule would define the term "associated consumer reporting agencies," to mean "a consumer reporting agency that maintains consumer files within systems operated by one or more nationwide consumer reporting agencies." This definition, however, is not subsequently used in the text of the Proposed Rule.

The Overview accompanying the Proposed Rule, however, states that it is the Commission's intent to require § 603(p) agencies to provide free annual file disclosures to consumers of files held by any of their associated consumer reporting agencies. 69 Fed. Reg. 13197. According to the Commission, this is the practical effect of the requirement in Proposed Rule § 610.2(d) that a § 603(p) agency provide a free annual file disclosure if it "has the ability to provide a consumer report to a third party relating to a consumer." No free disclosure obligation is imposed on the source from which a §

9

603(p) agency would obtain the consumer report, be it from an associated consumer reporting agency or some other consumer reporting agency.

While the Commission suggests that its intent is to require free annual disclosure of files held by associated consumer reporting agencies, Proposed Rule § 610.2(d) does not explicitly limit such disclosures to files obtained from such agencies. The provision requires that a § 603(p) agency provide a free annual file disclosure of any report for which it has "*the ability to provide* to a third party." (Emphasis added).[2] This could be read by some to include not only the files of associated consumer reporting agencies, but also any consumer reporting agency for which the § 603(p) agency acts as a reseller. Potentially, this would include the reports of other agencies participating in the centralized source. In fact, since the disclosure obligation is predicated on the § 603(p) agency's *ability* to provide a report to third parties, rather than the actual provision of such a report, the proposed rule might be read to require that the § 603(p) agency go out into the marketplace and purchase reports it would not otherwise sell for provision to consumers at no charge.

The Commission's proposal does not ensure disclosures to consumers because associated consumer reporting agencies are not required to disclose their files and § 603(p) agencies cannot disclose these files without permission.

The Commission's proposal is fundamentally flawed. It fails to achieve its intended purpose of maximizing the number of consumers eligible to obtain free annual

---

[2] This language also is inconsistent with the definition of a nationwide consumer reporting agency set forth in FCRA § 603(p). That definition concerns agencies that "compile and maintain" specified information on a nationwide basis, not consumer reporting agencies that have "the ability" to provide the reports of other consumer reporting agencies. The Commission has no authority to re-write the § 603(p) definition.

disclosures because the associated consumer reporting agencies will have no legal

obligation to make files available for disclosure.  At the same time, it potentially creates a

situation whereby § 603(p) agencies could be in violation of the rule depending solely on

the actions of the associated (or other) consumer reporting agency; as well as the

possibility that the § 603(p) agencies may have to purchase reports from associated (and

other) consumer reporting agencies for free distribution to consumers through the

centralized source.  The Proposed Rule creates an untenable situation for the § 603(p)

agencies; one not required or even supported by FACTA.

        The Commission's proposal appears to presume that associated consumer

reporting agencies will provide the reports.  An associated consumer reporting agency

would be required to provide a report directly to the consumer if the consumer contacted

that agency directly.  There is no statutory requirement, however, that a consumer

reporting agency make consumer reports available to consumers through third parties,

such as § 603(p) agencies.  Even if the § 603(p) agency were to characterize the

consumer request as an FCRA § 604 request made pursuant to the "written instructions"

of the consumer, the associated consumer reporting agency still would retain the

discretion to decline to provide the report.  *See, e.g.,* FTC Official Staff Commentary

604(2) (Item 2, Refusal to Furnish Report) ("The consumer reporting agency may refuse

to furnish the report because the statute is permissive, not mandatory").

        The free annual disclosure requirement proposed by the Commission is

fundamentally different from existing arrangements between § 603(p) agencies and

11

associated consumer reporting agencies. In the case of other FCRA-mandated free file disclosure obligations (*e.g.*, adverse action) the free disclosure obligation is imposed on the consumer reporting agency that prepared the report. Therefore, if a report is prepared (*i.e.*, owned) by an associated consumer reporting agency, that agency is obligated to provide a free file disclosure.

Under the FTC proposal, however, the associated consumer reporting agencies have no obligation to provide a free file disclosure, while the § 603(p) agency does. As a result, the Commission would put the § 603(p) agency in a position where it could be legally required to purchase or otherwise obtain reports for free distribution to consumers (a situation which might also put the § 603(p) agency in a weak, if not completely untenable, bargaining position with any associated consumer reporting agencies; agencies which could essentially name their own price for the reports).

Further, if the associated consume reporting agency simply refuses to permit the disclosure regardless of price, the consumer does not receive his or her file disclosure and the § 603(p) agency potentially could be found to be in violation of the Rule for not providing what it does not have the right to provide.

### The Proposed Rule's scheme is neither required nor supported by FACTA.

Nothing in FACTA or its legislative history suggests that a § 603(p) agency should ever potentially have to buy a credit file from another consumer reporting agency in order to make a free disclosure.

12

Section 211(a) of FACTA requires § 603(p) agencies to, in relevant part, "make all disclosures pursuant to Section 609 [of the FCRA] once during any 12-month period upon request of the consumer and without charge to the consumer." Section 609, in turn, requires every consumer reporting agency, upon request, to disclose to the consumer "all information in the consumer's file at the time of the request" subject to certain exceptions. Because the file disclosure requirement pertains to all consumer reporting agencies, it is clear that the Congress intended that each and every consumer reporting agency make a file disclosure, upon request, from its own files.[3]

Of course, not all files available through the nationwide consumer reporting systems are owned by the § 603(p) agencies; rather some are owned by "associated" consumer reporting agencies. This creates a problem since only the § 603(p) agencies are obligated to provide free annual disclosures. The Commission's stratagem to deal with this problem is to require a § 603(p) agency to make the § 211(a) file disclosure if the § 603(p) agency has the ability to provide the report to a third party relating to that consumer. In this way, the Commission hopes that its view of the Congress' intent will be met – that all consumers in all parts of the nation will be able to obtain an annual free disclosure of files from all components of each of the nationwide systems.

---

[3] This is actually industry practice and recognized by courts. There have been lawsuits against the associated agencies and those lawsuits go forward against the associated agency for failure to comply with FCRA—not against the national system to which the associated agency outsourcers its computer services. The FCRA as well as the FACT Act impose obligations on each consumer reporting agency regarding its files. The consumer files belong to the agency that has title to them, contracts for computer services, pays for the maintenance and storage of the files, and charges fees for the sale of the files. The consumer reporting agency that engages in consumer reporting activities is responsible for FCRA compliance for its files whether they are stored on a national system or outsourced to other data processing providers.

13

In the Overview of the Proposed Rule, the Commission attempts to support its

novel approach to file disclosures by citing to statements in FACTA's legislative history

indicating congressional intent that consumers be able to obtain a free annual disclosure

from each of the three § 603(p) agencies.  The Commission, for example, cites Senate

Report language indicating that "the centralized system shall allow consumers to obtain

free reports from *all three* [nationwide consumer reporting] agencies using a single

request."  69 Fed. Reg. 13197, (Commission's emphasis).   The intent of this language is

straightforward.  Consumers are entitled to obtain one free annual disclosure from each §

603(p) agency, not just from a particular § 603(p) agency in a given year.  Additionally,

such reports could be requested in a centralized source rather than having to go to each §

603(p) agency.  In the Commission's hands, however, this language is tortured into

giving the "appearance" of congressional intent to require each § 603(p) agency to

provide a free annual free file disclosure to each consumer whether it owns and controls a

file on the consumer or not.[4]

<u>The only way under FACTA to ensure the consumer's ability to obtain a file</u>
<u>disclosure is for the Commission to use its authority over "substantially</u>
<u>nationwide" consumer reporting agencies.</u>

It is unclear from the record set forth in the Overview of the Proposed Rule that

the Commission has properly evaluated whether to impose free annual file disclosure

---

[4] Taken to its logical conclusion, the Commission's interpretation of this language presumably evidences
the "appearance" of congressional intent that the § 603(p) agencies have a file to disclose to each consumer
even in cases where the consumer had no established credit and therefore has no file at all, since according
to the report language, consumers shall be allowed to obtain free annual disclosures from all three agencies,
apparently without regard to whether the agencies actually have files on the requesting consumer.  Such a
view, of course, is nonsensical.  Nevertheless, it is a logical outgrowth of the Commission's strained
reliance on this language to require the § 603(p) agencies to disclose the files of associated consumer
reporting agencies.

requirements on substantially nationwide consumer reporting agencies.  FACTA §

211(d)(6)(A) requires the Commission to determine, by rule, whether to require such

disclosures.  The Commission proposes not to require any substantially nationwide

consumer reporting agency to provide free annual reports, at least at this time.  69 Fed.

Reg. 13201.  FACTA § 211(d)(6)(B), however, requires the Commission to consider

certain factors "before making any determination under Subparagraph A."

The Commission, while noting the factors, gives no indication in the Proposed

Rule that it has actually considered those factors in its proposed determination not to

require substantially nationwide consumer reporting agencies to provide free annual file

disclosures.  The Commission gives no indication of the information that it has

considered in reaching its "determination," other than a general statement that the

Commission reached its proposed determination "in light of the information currently

available to it."

If the Commission's goal is to maximize the number of credit files subject to free

annual disclosure, the Commission should abandon the tortured approach it takes in the

Proposed Rule.  Instead, it should exercise its authority over "substantially nationwide"

consumer reporting agencies; authority which the Commission intentionally declined to

exercise under the Proposed Rule.  *See*, 69 Fed. Reg. 13201.  Associated consumer

reporting agencies are one type of "substantially nationwide" consumer reporting

agencies by virtue of their participation in a nationwide consumer reporting system and

15

the Commission could require these agencies to provide free annual disclosures and to participate in the centralized source.[5]  *See*, FACTA § 211(d)(6).

One of the factors the Commission is required by FACTA § 211(d)(6)(B) to consider in determining whether to require "substantially nationwide" consumer reporting agencies to provide annual free file disclosures is the "needs of consumers for access to consumer reports provided by consumer reporting agencies free of charge." The Proposed Rule, while wrong in its proposed solution, placed a significant value on the ability of consumers to be able to obtain free annual file disclosures from the three national systems.  This would argue in favor of a finding that associated consumer reporting agencies are required to provide free annual file disclosures.  This is enhanced in the case of affiliates that own tens of millions of files.  The financial burden on such agencies, while subject to variation, seem unlikely to be significantly different from the costs incurred by § 603(p) agencies to make file disclosures.  All of these factors, in our view, support the Commission's use of its authority over "substantially nationwide" consumer reporting agencies to mandate free annual disclosures.

### B.  Transition Rules—Proposed Rule § 610.2(i)

The success or failure of the centralized source will depend on the transition period in which the new free annual disclosure requirement is introduced to consumers,

---

[5] Such participation in the centralized source by the substantially nationwide consumer reporting agencies that are also associated with a § 603(p) agency could be direct or, if the Commission believed direct participation would confuse consumers, such agencies could participate indirectly through the § 603(p) agencies with which they are associated.  The key point is that the associated agencies must be required to make the free annual disclosure, if consumers are going to have an effective right to request free annual disclosure of these credit files.

§603(p) agencies, and data furnishers. This is the period in which consumer perceptions of the new right will be formed and the period in which consumer reporting agencies and data furnishers must develop the capacity necessary to meet their new obligations. It is also the period with the greatest potential to overwhelm the system. A hasty rollout of the centralized source to well over 200 million Americans over the course of nine months, as the Commission proposes, is inconsistent with FACTA and runs the risk of failure. A more gradual roll-out of the eligibility for free annual disclosure is essential if the implementation of this new consumer right is to be meaningful and successful for all participants in the credit reporting system.

Congress recognized that the manner in which this new right is introduced is the key to its ultimate success. FACTA § 211(d)(4) requires the Commission's regulations to "provide for an orderly transition" to the centralized source system.

Congress further mandated that the transition must be in a manner that "(A) does not temporarily overwhelm such [nationwide] consumer reporting agencies with requests for disclosures of consumer reports beyond their capacity to deliver; and (B) does not deny creditors, other users, and consumers access to consumer reports on a time-sensitive basis for specific purposes, such as home purchases or suspicions of identify theft, during the transition period." Alarmingly, key elements of the approach taken by the Commission are inconsistent with both the letter and the spirit of this congressional mandate.

A gradual, staggered transition is essential.

The length of the transition period proposed by the Commission is far too short. It is inherently uncertain what the consumer demand for the new free annual disclosure will be and whether consumers will treat this new right as a novelty to be requested only once or as an ongoing, integrated part of their annual financial practices. Accordingly, it is only logical to gradually implement and build the system over a two-year period to create a stable centralized source system instead of a rushed nine-month transition as the Commission has proposed. Doing so will enable actual demand experience to be developed and will not necessitate wild fluctuations in staffing and technology requirements.

The first year of this two-year transition should be used to gradually provide eligibility to consumers to receive their free annual disclosure. If consumer eligibility is cumulative—as opposed to permanently staggered—all consumers would first be eligible to obtain free disclosure at the end of the first full year. Accurate, reliable experiential data on which to build the permanent system will not be developed during this time since demand during the first year may be unusually high because of the novelty of the new right and the attendant publicity.

During the first six to nine months of the second year of the transition, the § 603(p) agencies will be able to collect more reliable demand data. In the later part of the second year, capacity could be adjusted in accordance with the empirical demand data

18

collected.  Therefore, by the first day of the third year, the centralize source will have
constructed a capacity capable of handling routine levels of consumer requests for free
annual disclosures.[6]

We believe that the transition plan would further be improved if the Commission:

o   Replaces the proposed geographic roll-out with a roll-out staggered on the
basis of date of birth.  Date of birth, unlike geography of residence does not
change, making it a convenient basis for staggering both as part of the initial
roll-out and permanently.

o   Begins with a more limited, smaller roll out in December 2004—to provide an
opportunity to gather consumer demand data, limit the impact of the roll-out
on other demands on § 603(p) agencies during the holiday season, and work
out any kinks that may occur in the system—expanding to larger population
segments as the roll-out progresses;  and

o   Divides the population into more than four segments (we believe that at least
six are necessary) to further manage the size of the eligible population and
therefore the initial demand as each population segment comes online.

---

[6] Even if the Commission were not to extend the transition period to the extent we believe necessary to
properly build the centralized source and preserve the integrity of the credit reporting system, revisions to
the transition in the Proposed Rule would still be necessary.  Under the Proposed Rule, the transition period
would end on August 31, 2005; the day before the Proposed Rule would bring the last region of the country
online.  As a result, the Proposed Rule unnecessarily would deprive the nationwide consumer reporting
agencies of the transition rule's high request volume relief just as the East is scheduled to come online.
This change would also base extraordinary request volume calculations in the East on the proposed
permanent daily rolling 90-day average, rather than the shorter rolling seven-day daily average standard
which would apply in other regions.  The transition rules should apply equally to the roll-out of the
centralized source in all regions.

<u>A reliable capacity safe harbor for the transition is essential given the inherent uncertainty of consumer demand and the time necessary to add capacity.</u>

The unreasonableness of the Commission's proposed approach is illustrated in the Commission's treatment of the proposed first week of the centralized source's operations. The Commission recognizes that for this period there is little or no data available upon which to predict consumer demand for the free annual disclosure, only limited experiential data from those states that currently require free annual disclosures. 69 Fed. Reg. 13198. The Commission places the full onus for estimating the initial demand on the § 603(p) agencies.

The Commission provides its own estimate of demand and capacity requirements for the first week[7] but then explicitly states that the § 603(p) agencies cannot rely on this estimate. 69 Fed. Reg. 13198, n. 21 (and accompanying text). As a result, if the § 603(p) agencies' estimate of daily consumer demand for the first week, proves to underestimate demand (even if they adopt the FTC's own estimates), the agencies could be in violation of the Rule (and potentially subject to consumer litigation) on the very first day of operation—all because the § 603(p) agencies fail to estimate a demand that the Commission itself admits is "inherently uncertain." 69 Fed. Reg. 13198. This scarcely strikes us as the way to start an "orderly transition."

---

[7] The Commission should clarify in the final rule that the capacity protections for the transition period are proportionate to the portion of the population then eligible to obtain the free annual disclosure from the centralized source. In other words, to use the Proposed Rule's scheme as an example, the Commission's 300% demand estimate would mean that when the West comes online on December 1, the Commission estimates that demand will be 300% of the current demand in those Western states, not 300% of demand nationwide.

20

In addition, the Proposed Rule's faulty definition of "adequate capacity," discussed in detail below, creates the possibility that the § 603(p) agencies will not necessarily be able to rely on their anticipated demand figure for even the first week. If the centralized source is overwhelmed on the first day, it could be argued that the § 603(p) agencies would have an obligation to increase their capacity during the first week. As a practical matter, it is simply not possible to quickly increase capacity to process requests, make mandated disclosures, and process consumer follow-up inquiries. As a result, the § 603(p) agencies effectively would have to build enormous excess capacity into the system from the start; 600% of current demand according to the Commission's estimate. 69 Fed. Reg. 13198-13199. Even if this capacity of 600% of current demand were built, there is no assurance that the §603(p) agencies would not be found in violation.

The Commission itself recognizes in the Overview that "it is clear that once the centralized source is designed and implemented, its capacity cannot be expanded quickly, *i.e.,* in a month or less." 69 Fed. Reg. 13198. We believe that the proper addition and training of back-office staff requires 60-90 days. Nevertheless, even using the Commission's estimate, it is clear that the Proposed Rule's requirement that the § 603(p) agencies be able to double their capacity in a week is unworkable.[8]

---

[8] As the Commission put it in the Overview when discussing the second phase of the transition, "Because it is tied to a short time period—i.e., seven days—this standard for extraordinary request volume in fact requires a rapid expansion of the system. If extraordinary levels of demand persist, the system's capacity would have to double every week to remain in compliance." 69 Fed. Reg. 13199, n. 22.

The Commission must correct these shortcomings and draft a rule that complies with the Commission's statutory obligations under FACTA § 211(d).  To do that we propose, at a minimum, the Commission must create a safe harbor which will protect the § 603(p) agencies provided they design the initial capacity for the first two years of operation in proportion with the 231% overall capacity suggested by the historical experience of the § 603(p) agencies in those states that already mandate a free annual disclosure.

### The proposed 200% trigger for extraordinary request volume is unworkable.

The Commission appears to have taken the view that by setting the threshold for "extraordinary request volume" (and thus for relief) at 200%--*i.e.* mandating that the § 603(p) agencies be prepared to handle two times as many requests as actually were requested during the prior week or 90 days, depending on the transition phase—the Commission will have met its obligations under § 211(d)(4) because the § 603(p) agencies will have built the capacity and will not, therefore, be overwhelmed.

Of course, this approach utterly fails to recognize the finite resources of the § 603(p) agencies.  It also fails to recognize that the free annual disclosure is not time sensitive in the same way as are requests for file disclosures relating to identity theft or adverse actions.  It is unfair, unreasonable, and inconsistent with FACTA to deny the nationwide consumer reporting agencies the relief Congress intended unless the agencies first build a system which is designed to have twice the reasonably anticipated capacity.

22

These problems are exacerbated by the Commission's failure to permanently stagger consumer eligibility to obtain the free annual disclosure, discussed below, and its proposal to structure the transition in a cumulative rather than consecutive manner. The result of the Commission's proposed approach, once fully implemented, is to create a cumulative potential request base during any given period of approximately 230 million Americans. From such a large base, a requirement that the number of requests exceed the specified daily rolling average by 200% imposes capacity requirements upon the § 603(p) agencies that are potentially so gigantic that it makes the prospect for obtaining relief little more than theoretical.

We strongly urge the Commission to lower the proposed threshold for extraordinary request volume, both for the transition period and for the permanent system, from 200% to 125%. Further, as discussed elsewhere in our comments, we urge the Commission to create a system of permanent staggering for consumer demand and, consistent with that, restructure the proposed transition so that the transitional rollout (geographic or otherwise) also operates in a consecutive rather than in a cumulative manner.

<u>Other aspects of the transition rule also require revisions.</u>

Several aspects of the transition rule are promising and, with revisions, could provide useful guidance for the § 603(p) agencies and consumers in their transition to the centralized source and free annual disclosures:

23

- <u>Modify the high request volume concept and make it permanent</u>. The Commission's proposed concept of allowing the nationwide consumer reporting agencies to delay a response to requests above a certain threshold also is helpful. We encourage the Commission to lower the threshold from 115% to any volume that exceeds the anticipated volume. It should not be necessary to run 15% above the anticipated demand for capacity before having the option of using the proposed relief for high volume. We also request the Commission make this concept part of the permanent surge protection rules.

- <u>Clarify relief in the event of high or extraordinary call volume</u>. In the Overview, but not the Proposed Rule itself, the Commission states that if the threshold for high or extraordinary call volume is reached the nationwide consumer reporting agencies are able to defer or queue requests without "accepting" them for purposes of triggering FACTA § 211(a) timing requirements. 69 Fed. Reg. 13199. We request the Commission to clarify how this relief would work and codify this relief in the text of the final rule itself for both the transition period and the permanent system.

In addition, we believe that the Commission should clarify that, for purposes of both the transition and the permanent system, a consumer's request is not "received"—and therefore the FACTA § 211(a) timing requirements are not triggered—until the identity of the consumer has been properly identified as required by FCRA § 610.

24

- **Add a safe harbor for capacity allocation for each centralized source request method
  during the transition.** The § 603(p) agencies have no reliable data with which to
  accurately predict what the allocation of consumer requests among the required
  request methods (*i.e.,* telephone, Internet, and mail) will be when the centralized
  source is introduced. The Commission estimates primarily "based on their
  knowledge of the industry" that the "overwhelming majority" of requests (75%) will
  be made via the Internet, 24% by telephone, and only one percent of requests by mail.
  69 Fed. Reg. 13202, n. 29 and 32. Given the lack of hard empirical data available,
  however, it should be permissible for consumer reporting agencies to begin the
  process by making a good-faith estimate for the distribution of capacity among the
  three request methods and have safe harbor protection. This initial estimate could be
  adjusted to better reflect actual consumer request patterns after a few months of
  empirical data has been obtained.

- **Add a safe harbor for request volumes over the course of a day.** The Proposed Rule
  recognizes concepts of capacity controls on a daily basis (*i.e.,* the rolling seven-day
  daily average and the daily rolling 90-day average). The Proposed Rule, however,
  fails to address (or provide relief) for the ebb-and-flow of demand within any given
  day. For example, if the daily capacity requirement is 1000 reports, does the
  centralized source have to be able to handle all of those requests at once? We do not
  believe that the Commission intends such an outcome. As drafted, however, some
  might argue that under the Proposed Rule consumers should be able to obtain their
  requests upon demand, unless and until the total number of requests triggers high or

extraordinary request volumes for the day. We ask that the Commission make clear that the fact that a consumer may get a busy signal or is not able to connect to the Internet site does not constitute a violation of the rule, provided that the centralized source maintains the adequate overall daily capacity.

- <u>Clarify that certain ineligible contacts to the centralized source can be blocked.</u>

  - <u>Consumers who attempt to contact the centralized source before their regional roll-out</u>. The Commission properly notes in a footnote that consumers may attempt to contact the centralized source before free annual disclosures are rolled out in their region. 69 Fed. Reg. 13196, n. 10. The Commission should revise its discussion, however, to make it clear that the centralized source and participating consumer reporting agencies are able to use technical means, where available, to block ineligible consumers from contacting the centralized source. For example, when accepting requests by telephone, the centralized source should be permitted to block calls from consumers in any geographic area which is not then eligible to obtain the free annual disclosure. Such blocking would permit the centralized source to preserve its capacity for consumers actually eligible to obtain free disclosures at the time they contact the centralized source.

  - <u>Contacts through credit repair clinics</u>. The Proposed Rule should also be revised to give the centralized source and participating consumer reporting

agencies the ability to take steps to decline requests funneled to the centralized source through third party entities, such as credit repair clinics. This should include the ability to refuse to accept high quantities of requests from the same IP or e-mail addresses.

### C. Permanent Extraordinary Request Volume—Proposed Rule § 610.2(e) and Permanent Staggering of Consumer Eligibility

Once the transition period is over, it is necessary to provide a strong framework to ensure that the centralized source can efficiently and routinely meet its demand obligations under the Rule.

<u>Permanent staggering of consumer eligibility is an important means of managing demand and is contemplated by and wholly consistent with FACTA.</u>

FACTA § 211(d)(2) requires the Commission, in prescribing the centralized source regulations, to consider:

(A) the significant demands that may be placed on consumer reporting agencies in providing such consumer reports;

(B) appropriate means to *ensure* that consumer reporting agencies can satisfactorily meet those demands, including the efficacy of a system of staggering the availability to consumers of such consumer reports; and

(C) The ease by which consumers *should be able to* contact consumer reporting agencies with respect to access to such consumer reports. (Emphasis added).

The Commission's Proposed Rule ignores the plain language of the statute, maximizing consumer ease of access at the expense of the staggered availability contemplated by the statute. FACTA charges the Commission with drafting regulations that *ensure* that the nationwide consumer reporting agencies can meet the demands of the annual free disclosure requirement. "Ensure" is a definitive and strong standard and stands in stark contrast to the use of "should be able to" in the ease-of-access provision which follows. Inexplicably, the Commission's proposal essentially inverts the two requirements elevating, admittedly important, consumer ease-of-access considerations above all else. How does this scheme account for the significant demands facing the § 603(p) agencies and *ensure* that consumer reporting agencies can satisfactorily meet those demands? Quite simply, it does not.

FACTA § 211(d)(2)(B) mandates that the Commission consider "appropriate means to *ensure* that consumer reporting agencies can satisfactorily meet those demands, including the efficacy of a system of staggering the availability to consumers of such consumer reports." However, the record presented by the Commission in the Overview provides precious little evidence that the Commission considered means to "ensure" the ability of the nationwide consumer reporting agencies to meet the demands placed on them, through staggering or otherwise. The record certainly presents no specific evidence that the Commission fully considered the efficacy (*i.e.*, effectiveness) of one or more systems of staggered availability.

The Commission states that it considered the matter, as required, but "[b]ased upon the information currently available, there is no basis for concluding ongoing staggering of the availability of annual file disclosures is necessary."[9]  69 Fed. Reg. 13196.  The Commission's apparent belief that permanent staggering must be "necessary" to be included in the Rule is erroneous.  The statutory standard is to consider appropriate means to ensure the ability of the § 603(p) agencies to comply, not such means as the Commission may deem absolutely necessary.  Given the intent of the provision to provide relief to the § 603(p) agencies, it is bad law and bad policy to impose a necessity standard.  Given the language of the statute, where good faith disagreements exist, the needs of the § 603(p) agencies should receive the benefit of the doubt.

In the Commission's view, permanent staggering is "unnecessary" based in part upon other FACTA provisions which provide the § 603(p) agencies with relief.  The Commission cites, for example, the FACTA mitigation provision which permits additional time  for the processing of free annual disclosures and reinvestigation requests arising there-from.  The Commission's reliance on these provisions as a basis for rejecting permanent staggering is wholly misplaced and improper.  Having written FACTA, the Congress was most surely aware of these provisions.  If the Congress had believed these  provisions were a sufficient means of ensuring the ability of the nationwide consumer reporting agencies to comply, then the FACTA § 211(d)(2)(B) requirement for the Commission to consider and evaluate the effectiveness of staggered

---

[9] There is no indication of what that information is or its source.  The FACTA reference to "staggering" is in the discussion of the consumer reporting agencies' ability to meet the demand.  In other words, staggering is focused on the consumer reporting agencies' side of the balance.  The Proposed Rule appears to give that side of the balance no weight.

availability systems would not have been adopted.  If anything, the Commission should

consider all of the other new requirements FACTA imposes on the § 603(p) agencies and

data furnishers as part of its assessment of what steps are necessary to ensure that the

centralize source activity does not overwhelm the system.

An interesting aspect of the Commission's discussion is its speculation that the

staggered geographic roll-out could have some residual demand-smoothing affects akin

to permanent staggering.  69 Fed. Reg. 13197.  Curiously, however, the Commission

makes no mention of having considered permanent geographic staggering or why that

method is inappropriate.[10]  The Commission references consideration of birth month or

birth quarter as a means of permanent segmentation but rejects them because "[t]hese

proposals would require a year to fully roll out, and there is concern that a birth month or

birth quarter scheme may be difficult to convey to consumers."  69 Fed. Reg. 13198.

Given that the Proposed Rule's geography-based roll-out spans parts of ten

months, we fail to understand the perceived harm of conducting the roll-out over an

additional two months.  Further, the Commission's "concern" that a birth month system

may be difficult to convey to consumers is not explained and not self-evident.  We

assume that the availability of the free annual disclosure based on date of birth or other

---

[10] The Commission also pledges to "closely monitor the progress of the transition and the capability of the
nationwide consumer reporting agencies to respond to actual request volume and may adjust the rule, as
necessary or appropriate, in the future."  69 Fed. Reg. 13197.  While we appreciate the Commission's
commitment to make changes as may be necessary or appropriate, such on-the-fly changes are only likely
to be helpful in correcting minor problems that may develop.  The Commission is unlikely to be able to
correct the fundamental flaws in its current proposal before significant damage is done to the nationwide
consumer reporting agencies and system.  Also, any subsequent changes made by the Commission may
lead to consumer confusion and dissatisfaction.

30

means would be made known to consumers in the same manner as a geographic roll-out (*i.e.*, through public education efforts, in response to inquiries, and through the media).

There is nothing inherently confusing or complicated about date of birth staggering. Consumers know when their birthdays are and they appear to have little problem understanding that events such as driver's license renewal, identity card renewal, and vehicle registration are commonly tied to their birthday. Birth-month or quarter provides a clean, fixed means of staggering availability.

<u>Other aspects of the extraordinary request volume concept also need to be revised.</u>

In addition to the failure of the Commission to consider and adopt permanent staggering, the Proposed Rule's limited permanent surge protection provisions are seriously flawed. For example, conditioning of the applicability of permanent extraordinary request volume on the faulty demand "anticipation" requirements in Proposed Rule § 610.2(c), discussed elsewhere in our comments, is ill-advised and should not be included in the final rule.

In addition, the use of 200% as the trigger for permanent extraordinary request volume is untenable and should be reduced to 125% of the daily rolling 90-day average. In addition, as previously noted, we also believe the Commission should include the concept of high request volume in the rules for the permanent period following transition.

31

### D. Adequate Capacity and Requirement to Anticipate—Proposed Rule §§ 610.2(b)(2)(i) and 610.2(c)

Section 610.2(b)(2)(i) of the Proposed Rule would require that the centralized source "has adequate capacity to accept requests from the reasonably anticipated volume of consumers contacting the centralized source through each request method, as determined in accordance with paragraph (c) of this section." The proposed paragraph (c), in turn, would require the § 603(p) agencies to "implement reasonable procedures to anticipate, and to respond to the volume of consumers who will contact the centralized source…"[11] We believe that the Commission's proposal would impose an unnecessarily unworkable and fatally vague capacity obligation on the § 603(p) agencies. The harm posed by this proposal is exacerbated by conditioning the proposed anticipation requirement to the ability of § 603(p) agencies to qualify for relief from extraordinary demand.

We believe that the Proposed Rule mistakenly combines concepts that should be kept separate. Any "adequate capacity" requirement should be based on historical information (*i.e.*, the daily rolling 90-day average) once reliable data becomes available. The standard should not be based on a vague duty to "reasonably anticipate" volume During the transition period, the daily rolling 90-day average should be replaced with an alternative standard, 231% of current capacity, as discussed in our comments about the proposed transition rules.

---

[11] Section 610.2(c) also includes contingency planning requirements. We address this aspect of § 610.2(c) separately elsewhere in our comments.

Similarly, the ability of the § 603(p) agencies to avail themselves of the Proposed Rule's high request volume and extraordinary request volume provisions should not be contingent on the reasonable anticipation standard. Use of the duty to reasonably anticipate in this context only adds uncertainty to the availability and reliability of the relief contemplated under these provisions. The entire purpose of the daily rolling 90-day average should be to provide an empirical, bright-line, baseline for calculating extraordinary request volume. Incorporating the § 610.2(c) requirement that § 603(p) agencies develop reasonable procedures to anticipate demand into this process would add needless uncertainty.

What practical use is the proposed daily rolling 90-day average if a § 603(p) agency's reliance on that average is subject to second guessing? For example, does the § 603(p) agency in determining capacity lose its ability to rely on the daily rolling 90-day average because its procedures do not require it to add additional capacity if it has prior knowledge that a national television news magazine was going to run a story touting the free report and consumer response to that report, at least in part, triggered an extraordinary call volume situation? Does it matter if the § 603(p) agency only had 24 hours notice? A week? If the § 603(p) agency with knowledge failed to communicate that to the other § 603(p) agencies, would those agencies lose their ability to rely on the daily rolling 90-day average? Would the § 603(p) agencies be able to rely on the daily rolling 90-day average if another newsmagazine did a story within the period covered by the daily rolling 90-day average? Does it matter which newsmagazine had higher ratings? Such uncertainty needlessly undermines the efficacy of the surge protection

mechanism. The purpose of extraordinary request volume provisions is supposed to a means by which the § 603(p) agencies are protected from demand spikes; as such, it should be a reasonable, reliable, bright-line rule.

Finally, as discussed separately elsewhere, we believe that adequate capacity for the transition period should be a set 231% of current requests and, after the transition, a function of the daily rolling 90-day average of requests made. In addition, contingency planning and "force majeure" events should be treated separately from the issue of "adequate capacity" in the final rule. These issues, at best, are tangentially related to adequate capacity and, in our view, are best handled separately.

### E. Contingency Planning Requirements and *Force Majeure*—Proposed Rule § 610.2(c)

<u>The contingency planning requirements are inappropriate and unnecessary.</u>

Section 610.2(c) of the Proposed Rule would require the § 603(p) agencies to "anticipate and respond to" consumer demands on the centralized source, including the development and implementation of "contingency plans to address circumstances that may materially and adversely impact the operation of the nationwide consumer reporting agency, a centralized source request method, or the centralized source." The section also provides examples of circumstances that "may materially and adversely impact operations." Finally, it delineates steps that the § 603(p) agencies must take to minimize the impact of such circumstances. Most of the examples cited, however, are either "Acts

of God," such as natural disasters or man-made systemic disasters such as telecommunications interruptions.

The proposed contingency planning obligations are neither required nor authorized by FACTA.  To the contrary, the doctrine of *"force majeure"* is long established in law.  It provides that Acts of God, man-made disasters such as war or terrorist attacks, or other events beyond the control of the actor excuse the actor from non-performance of both contractual and statutory obligations.  The Proposed Rule turns *force majeure* on its head, by requiring the § 603(p) agencies to somehow anticipate everything from hurricanes to power grid failures and be prepared to perform despite those disasters.  The fair, appropriate, and legally reasonable approach would be for the Commission to provide §603(p) agencies relief from  the delivery of free, curiosity reports during a period of natural or manmade disaster or other event beyond the control of the § 603(p) agencies.

Furthermore, neither logic nor law suggests that the Commission should impose such requirements for free annual "curiosity" requests.  Especially since none are required by the FCRA to ensure ongoing processing of potentially time-sensitive requests for file disclosures, such as those that are prompted by adverse actions by users based in whole or in part on the contents of a consumer report.

In addition, some of the proposed contingency requirements are repetitive of other legal requirements.  For example, the Standards for Safeguarding Customer Information,

16 CFR 314.2 to 314.4 already require an information security program defined to include the "administrative, technical, or physical safeguards you use to access, collect, distribute, process protect, store, use, transmit, dispose of, or otherwise handle customer information."  16 CFR § 314.2(c).  This includes "detecting, preventing, and responding to attacks, intrusions, or other systems failures."  16 CFR § 314.4(b)(3).

### Contingency planning should be replaced with a *force majeure* provision.

Instead of the proposed contingency planning requirements, the final rule should include a *force majeure* provision.  This would  make clear that the § 603(p) agencies acting individually or through the centralized source are excused from compliance obligations when noncompliance is caused by Acts of God, war or other circumstances beyond their control.  The Commission previously has recognized the efficacy of *force majeure* provisions in its approval of consent decrees in January 2000 with Equifax, Experian, and TransUnion regarding service levels for handling consumer telephone calls.  These consent decrees state that the agencies:

> shall not be deemed in violation of [provisions of the decree that provide the obligation to comply with the law and meet certain service levels] of this Consent Decree if circumstances beyond defendant's reasonable control (such as acts of God, telecommunications interruptions, labor shortages caused by illness or organized labor action, or significant increases in call volume due to unforeseen circumstances) preclude it from complying… provided that the defendant takes reasonable steps to minimize the impact of these events on its toll-free telephone number service and promptly restores service to levels that comply with this Consent Decree.

We believe that a comparable *force majeure* provision should be included in the final rule, independent of any contingency or adequate capacity requirements.

36

**F. Centralized source participation, funding and liability—§ 610.2(b)**

Section 610.2(b) of the Proposed Rule requires all nationwide consumer reporting agencies to jointly design, fund, implement, maintain, and operate the centralized source. In the Overview of the Proposed Rule, the Commission notes that new entrants cannot be barred from participation in the centralized source and that all participants may be jointly liable for violations of the centralized source rules. This provision of the Proposed Rule should be revised in several important respects:

- Section 610.2(b) should be revised to apply to all centralized source participants, not only to nationwide consumer reporting agencies. Accordingly, the provision should be revised to include any "substantially nationwide" consumer reporting agencies that the Commission may require to participate in the centralized source in the final rule or subsequently. Conforming changes would need to be made throughout the Proposed Rule where existing references to a nationwide consumer reporting agency or agencies should be a reference to any centralized source participant or participants.

- The Proposed Rule should be revised to explicitly allow the original centralized source participants to recover from new entrants a reasonable portion of the costs incurred to design and implement the centralized source. We believe this is implicit in the Proposed Rule, but believe this should be

made explicit, given the Commission's proposed bar on prohibiting participation by new entrants.

- The Commission should clarify the potential for joint liability under the Proposed Rule. It should make clear that such liability may only arise, if at all, as a result of a violation of the rule relating to an aspect of the rule subject to joint control. If one centralized source participant fails to maintain the requisite capacity to meet consumer demand, such a failure should not result in liability for other centralized source participants. In addition, with respect to joint activities, a participating consumer reporting agency's potential liability should be limited to only that which is commensurate with its role in any violation; if a centralized source participant were to become insolvent, for example, its share of any liabilities should not have to be born by other centralized source participants.

- The Proposed Rule should be modified to clarify that the centralized source can be established as a separate legal entity, to be funded and controlled by the centralized source participants.

## G. Enforcement

The Commission is required by FACTA to implement the centralized source requirements with consideration for the potential strain on the § 603(p) agencies, as well as appropriate means to ensure that the agencies can comply. We believe that an appropriate means to ensure that §603(p) agencies can comply is to mitigate the potential

liability risk posed by private rights of action (under FCRA §§ 616-617), including class actions potentially on behalf of millions of consumers.

For each private right of action that can be brought in this context (under FCRA §§ 616-617), the § 603(p) agencies and other participants in the centralized source could be exposed to potentially significant recurring liabilities and expenses. Claims that are limited when brought individually can have a significant effect on particular firms and whole industries when brought as a class action purportedly on behalf of millions of consumers. These effects could include (1) increased prevention costs, as companies seek to reduce the risk of such litigation through more rigorous monitoring, insurance and other risk-spreading mechanisms; (2) increased transaction costs, including legal and administrative resources; (3) indirect costs to the economy, due to disruptions caused by higher transaction and compliance costs, delays and degradation in the quality and completeness of credit reports; and (4) uncertainty costs, as driving down the rate of consumer claims to acceptable levels may simply become too expensive.

Such private enforcement and the attendant potential costs are unnecessary in the centralized source context. The Commission has already stated its intent to "closely monitor the progress of the transition and the capability of the nationwide consumer reporting agencies to respond to actual request volume and may adjust the rule, as necessary or appropriate, in the future." 69 Fed. Reg. 13197. As a result, particularly given the small number of entities participating in the centralized source, there is no public policy benefit to private actions in this area.

We urge the Commission, therefore, to craft the final rule to minimize the potential exposure faced by the § 603(p) agencies and other potential participants in the centralized source from private rights of action.  This can be done through the use of clear standards, safe harbors, and a requirement that notice and an opportunity to cure any potential violations be provided before enforcement actions can be taken.

### H. Communications that interfere with, detract from, contradict, or otherwise undermine the purpose of the centralized source—Proposed Rule § 610.2(g)

Section 610.2(g)(1) of the Proposed Rule requires that "[a]ny communications or instructions, including any advertising or marketing, provided through the centralized source shall not interfere with, detract from, contradict, or otherwise undermine the purpose of the centralized source..."  This is followed in § 610.2(g)(2) by four examples of activities, such as so-called "pop-up" advertising, which would violate that standard. We agree that the conduct identified in the four examples should be prohibited.

We are concerned, however, that the language in § 610.2(g)(1) is unduly broad and vague.  Specifically, the phrase, "interfere with, detract from, contradict or otherwise undermine..." likely will subject § 603(p) agencies to needless and onerous litigation. The language could also be misinterpreted or misapplied to prohibit legitimate and appropriate commercial messages.  We note that to the extent the Commission's examples address situations where consumers are misled, the Commission retains

enforcement authority under Section 5 of the FTC Act. Therefore, we urge the Commission not to include this broad language in the final rule.

### I. Security—Proposed Rule § 610.2(f)

Section 610.2(f) of the Proposed Rule would incorporate the Standards for Safeguarding Customer Information (Safeguards Rule) promulgated by the Commission pursuant to the Gramm-Leach-Bliley Act (GLB) into Proposed Rule. This provision should not be included in the final rule. FACTA includes no such requirement and we believe that it is inappropriate for the Commission to use an FCRA rule making to incorporate and apply regulations promulgated pursuant to separate statutes by reference. Congress has set the parameters for the applicability and enforcement of GLB and its derivative regulations, including the Safeguards Rule. It is not the role of the Commission to do so.

Setting aside the inappropriateness of the Commission's importation of a GLB requirement into a FACTA rulemaking, it should be emphasized that incorporation of the Safeguards Rule into the Proposed Rule serves no useful purpose. The Commission stated in the commentary accompanying the Safeguards Rule that the Safeguards Rule is applicable to consumer reporting agencies and supplements any FCRA-mandated protections for customer information. *See*, 67 Fed. Reg. 36485-36486. As such, proposed § 610.2(f) would be repetitive on matters of substance and it would serve no purpose other than to create possible private rights of action (under the FCRA) for

41

Safeguards Rule violations, where no such private right of action currently exists (under GLB). If Congress had intended that the GLB Safeguards Rule be enforceable by means of a private right of action, one assumes that it would have done so through GLB rather than relying on the Commission to do so piecemeal by incorporating the Safeguards Rule by reference into statutes such as the FCRA that include a private right of action.

### J. Instructions to Consumers—Proposed Rule § 610.2(b)(2)(iv)

Section 610.2(b)(2)(iv) of the Proposed Rule requires the centralize source to provide consumers contacting the centralized source with certain clear and easily understandable information and instructions. We agree with the goal of this provision; we believe, however, that some of the specific requirements should be removed or clarified.

Proposed Rule § 610.2(b)(2)(iv)(A) would require the centralized source to provide "information on the progress of the consumer's request while the consumer is engaging in the process of requesting a file disclosure." This requirement is unclear and, assuming we even understand it, appears to be wholly unworkable in some cases. For example, how is it possible for the centralized source to comply with this requirement with respect to a consumer using the mail request mechanism? With respect to telephone requests, would the proposed standard be satisfied by informing the consumer of any anticipated hold time that may be necessary to connect to the system? Does a caller or

internet mechanism user have to be informed how many questions there will be and which question they are on?

We do not believe that such requirements benefit consumers. Further, we note that to the extent to which such disclosures take time to communicate this will expend time that could otherwise be used to actually process the request. Thus, this proposed requirement makes the centralized source slower and more burdensome both to consumers and to the centralized source.

Similarly, with respect to Proposed Rule § 610.2(b)(2)(iv)(C), which requires certain information to be conveyed in the event that the consumer cannot be properly identified, if the consumer is using the telephone method, the Commission should clarify that the directions referenced in (C)(2) can be made available to the consumer in conjunction with the form referenced in (C)(3) and that it is not necessary to provide such direction by telephone.[12]

### K. Effective Date—Proposed Rule § 610.2(h)

Proposed Rule § 610.2(h) would establish an effective date of December 1, 2004 for the Proposed Rule. We support this provision. If the Commission issues the final

---

[12] The Commission's discussion of the telephone mechanism in the Overview of the Proposed Rule states that "an estimated 1% (or 40,000) will not have telephone equipment compatible with an automated system and may need to be serviced by live personnel." 69 Fed. Reg. 13202, n. 32. We do not believe that any live personnel are necessary for the telephone method. If a consumer's telephone equipment does not permit use of the fully automated system, current technology permits the consumer to use a function akin to leaving a detailed message, which can subsequently be transcribed for processing.

rule in June, this would give covered consumer reporting agencies six months to evaluate the final rule and rely upon it to design and build the necessary infrastructure for the centralized source and prepare for the possibility that millions of Americans will begin requesting free annual disclosures beginning December 1. These activities must be coordinated among all consumer reporting agencies participating in the centralized source, which adds to the amount of time necessary design and implement any system. As such, six months is the absolute minimum amount of time necessary to implement the final rule. We note that the six-month implementation period does not create any material harm to consumers, who continue to be able to obtain copies of their consumer report. We urge the Commission to retain the December 1 effective date in the final rule.

### L. Proposed Standard Form—Proposed Rue Part 698, Appendix D

We propose several modifications to the Commission's proposed standard form in order to more precisely state the data elements required for identity authentication purposes:

- Instead of requesting "Your Full Name," the form should specifically request, first name, last name, middle initial, and suffix. The form should also request any other name used within past two years.

- Street address should specify that home residence address is being requested and also include a request for apartment or unit number, if applicable.

- The form should request former residential address(es), if the consumer has resided less than two years at the current address.

44

- The form should be revised to give consumers the option to purchase their credit score in accordance with FCRA §§ 609(a)(6) & 609(f). As a technical matter, consumers that request only a file (and not a score disclosure) must merely be advised pursuant to § 609(a)(6) that the consumer also has the right to request and obtain the score. We believe that providing this disclosure up front, while not required, benefits consumers by allowing them to request both file and score disclosure at the same time. It is also a more consumer friendly approach in that it is far more efficient than the alternative scenario of providing the file disclosure alone, then requiring the consumer to make a second contact to request the score. This approach will also provide cost savings for the § 603(p) agencies through fewer, more efficient consumer contacts: fewer instances in which proper identification of the consumer would need to be established; and, in the case of mail communications, fewer mailings to the consumer.

- The statement on the form that the consumer "can expect to receive your report within 15 days after we receive your request" should be revised to reflect the fact that the 15 day requirement is not triggered until the consumer has been properly identified. This statement should also be revised to indicate that, in the case of mail disclosures, that the disclosure will be "sent" not later than 15 days from proper identification, rather than "received" since the timing of delivery by the U.S. postal service may vary and is beyond the control of the § 603(p) agencies.

- Information on how consumer would like to receive their free annual disclosure should be deleted. Consumers should be able to choose which of the centralized source options through which a request for the free annual disclosure is made, but

45

distribution should be by the means made available by the consumer reporting agency.

- The portion of the form offering consumers the opportunity to be contacted by telephone in order for the agencies to request additional information should be deleted. The means of contact should be left to the discretion of the consumer reporting agency, as there may be security reasons to use a particular request method. The paragraph about "more information on obtaining free credit report" should also be deleted. If the consumer is completing the request form, the consumer already is aware of his or her ability to obtain the free report.

- Consumer reporting agencies should be authorized to adapt the form for Internet requests.

- Finally, the form should be revised to include consumer certifications that the information supplied is correct and truthful and that the consumer understands that criminal penalties may face anyone who falsifies a request.

### M. Questions Posed by the Commission

The Commission posed a series of questions on the Proposed Rule for comment. *See*, 69 Fed. Reg. 13204-13206. We have addressed the issues raised by many of these questions in the preceding comments. In addition, please see the comments below regarding specific questions posed by the Commission.

**Question Set 4. Associated Consumer Reporting Agencies**

We have addressed the Commission's proposed concept of "associated consumer reporting agencies" at length in the body of our submission. We believe, however, that the proper treatment of this matter in the final rule is so imperative that we address the issue again here in detail.

*Is the proposed rule's requirement that if nationwide consumer reporting agencies have the ability to sell a consumer report to a third party they must provide an annual file disclosure to that consumer through the centralized source appropriate?*

No, we cannot emphasize strongly enough just how unfair and inappropriate it is to purport to require § 603(p) agencies to disclose files that they do not own and create the possibility that they will have to purchase reports from third parties for free distribution to consumers. Such an outcome is wholly inconsistent with the letter and the spirit of FACTA. To the extent that the Commission is concerned that consumers should obtain free file disclosures from associated consumer reporting agencies, the Commission can draw on its authority over "substantially nationwide" consumer reporting agencies to require these agencies to make free annual disclosures. If the Commission finds this authority to be insufficient, the proper recourse is to return to Congress to seek additional authority, not try to require § 603(p) agencies to go out and buy reports for consumers.

47

*(a) Should the rule specifically address the relationship between nationwide consumer reporting agencies and associated consumer reporting agencies…If so, how should the rule address this relationship?*

The final rule should only address this relationship if it is necessary to the formulation of a rational, reasonable, final rule. (As noted above, the Proposed Rule itself does not use the term at all after defining it).

In our view, the rule should address the relationship between nationwide consumer reporting agencies and their affiliates by deeming associated consumer reporting agencies, by virtue of their participation in a nationwide consumer reporting system, to be substantially nationwide in character. Such a finding would meet the Commission's stated goal of maximizing the consumer's ability to obtain file disclosures.

Unlike the scheme formulated in the Proposed Rule, this approach would actually guarantee the ability of consumers to obtain a copy of an associated consumer reporting agency's file (an outcome that cannot be compelled under the Proposed Rule's formulation). This approach would also spread the burden of compliance proportionately among all the consumer reporting agencies that participate in nationwide systems. As such, it would be unnecessary to attempt to force the § 603(p) agencies to buy reports for free distribution.

*(b) Is the definition of associated consumer reporting agency contained in section
610.1(b)(2) clear and adequate?  To what other entities, besides those described
under Section II, above, might this definition apply?*

If the definition is to be retained, we believe that it should be amended to reflect
that the associated consumer reporting agency owns the files that it maintains on another
consumer reporting agency's system.

Regardless of the efficacy of the definition itself, as noted in our discussion of
associated consumer reporting agencies in the main body of our comments, the Proposed
Rule arguably does not limit the relevant disclosure requirement to associated consumer
reporting agencies (although this appears to have been the Commission's intent as judged
from the Overview).  As drafted, the Proposed Rule could be interpreted to require that
the § 603(p) agencies purchase reports from any consumer reporting agency from which
they have the "ability" to do so, whether the consumer reporting agency that compiles
and maintains the file is an associated consumer reporting agency or not.

*(c) What will be the effect of the rule on the contractual relationships that exist
between nationwide consumer reporting agencies and their associated consumer
reporting agencies?  How could the rule address these effects?*

The Proposed Rule could have significant adverse effects upon the contractual
relationships between the § 603(p) agencies and their associated consumer reporting

49

agencies. The Proposed Rule places an obligation on the § 603(p) agencies to disclose files that they do not own, without placing any corresponding obligation on the file owner. This is significantly different from the FCRA's other file disclosure requirements, where the ability to disclose a file, and at what cost, is an obligation of the consumer reporting agency that owns the file. In the case of an associated consumer reporting agency, it would therefore have a statutory obligation to provide a free file disclosure, in the case of an adverse action, for example. While there is no requirement that this disclosure be made through the § 603(p) agency, the parties may agree to do so, by contract, as a matter of mutual agreement.

Under the scheme proposed by the Commission, however, none of the essential elements of the current system are present. First, the associated consumer reporting agency has no obligation to make the disclosure. Second, the associated consumer reporting agency has little, if any, incentive to make the disclosure given the potential reinvestigation workload that may result. Third, rather than a contractual arrangement of mutual agreement, the proposal puts the § 603(p) agencies virtually at the mercy of their associated consumer reporting agencies because the § 603(p) agency is the one with the legal disclosure obligation under the Proposed Rule, not the associated consumer reporting agency. As such, the § 603(p) agency runs the risk of standing in violation of its regulatory obligations under the Proposed Rule if it fails to purchase the file at whatever price demanded by the associated agency.

The § 603(p) agencies would have little leverage in such situations other than to, perhaps, to threaten to terminate their contractual relationships with any associated consumer reporting agency with which the § 603(p) failed to conclude a satisfactory arrangement. This option, however, presents two significant drawbacks. First, the resulting degradation if not outright destruction of the national credit reporting systems that this would entail could have a range of unanticipated adverse effects on the credit economy and the financial services industry. Second, it is unclear to what extent the option would even be available to the § 603(p) agencies, given the Commission's proposed rules implementing the circumvention requirements of FCRA § 629.

*(d) What are the number and nature of associated consumer reporting agencies doing business in the U.S.? What is the scope of their operations? ...*

As of April 2004, Equifax has four system affiliates (referred to in the Proposed Rule as "associated consumer reporting agencies." The files owned by these affiliates represent nearly 22% (i.e., over 45 million files). These affiliate-owned files constitute all or part of the files available on the Equifax system for 16 states.

Our largest affiliate owns over 40 million files (approximately 21% of the total files on the Equifax system). The files represent all or part of the files on the system for 15 states.

**Question Set 6. Consumer Communications.** *Question 6(e): Are there compelling reasons why nationwide consumer reporting agencies should not be allowed to use separate identification procedures in the centralized source?*

No. In fact, the opposite is true. It is essential that each consumer reporting agency participating in the centralized source have the ability to use its own identification procedures to properly identify consumers. As the Commission quite rightly states in the Overview of the Proposed Rule, failure to properly identify consumers could result in increased incidence of identity theft and other fraud. 69 Fed. Reg. 13195. Each consumer reporting agency has developed its own procedures for properly identifying consumers that request file disclosures from that agency.

While some aspects of proper identification may be the same from one consumer reporting agency to another (such as requests for basic demographic information), other aspects, particularly involving online requests, may be unique to a particular consumer reporting agency or rely upon a consumer's knowledge of information in the requested file that may be unique to a particular consumer reporting agency (such as information about a particular tradeline).

No consumer reporting agency should be forced to disclose a file based on the identification procedures of another party. This is particularly true since each consumer reporting agency has an independent obligation to properly identify consumers pursuant to FCRA § 610 (and potential liability for a failure to do so).

We appreciate the Commission's recognition in the Overview of the Proposed Rule of the importance of allowing each agency to use its own procedures to achieve proper identification. We hope, in fact, that the Commission will strengthen its statements in this regard by including a rule of construction in the final rule making it explicit that the use of separate procedures for proper identification shall be deemed to comply with the "single request" requirement.

**Question Set 8. Marketing.** In this question set, the Commission poses a series of questions about the use of the centralized source to convey advertising or marketing to consumers.

As discussed in the body of our submission, we believe that the examples posed by the Commission in § 610.2(g) are beneficial, but that the general rule those examples support is overly broad. We support the Commission's premise, however, that unfair or deceptive communications, marketing or otherwise, should not be made through the centralized source.

We appreciate the Commission's recognition of the value of advertising through the centralized source. The Proposed Rule, and the FACTA obligations that it implements, impose significant financial burdens on participating consumer reporting agencies. The ability to appropriately market products and services that may be of additional interest to consumers provides a unique opportunity for consumer education.

The Commission asks whether particular products are inappropriate subjects for marketing through the centralized source, citing examples such as credit scores and credit monitoring services. We believe that these products are prime examples of products and services that should be marketed through the centralized source. In the case of credit scores, the ability to purchase scores is new consumer right under FACTA, and one we would think the Commission would like to promote. Likewise, credit monitoring services provide consumers with the opportunity to take a more active role in protecting themselves against identity theft or even the inadvertent introduction of errors into their credit file.

In the Overview to the Proposed Rule, the Commission references the ability of participating consumer reporting agencies to market "their" products and services through the centralized source. 69 Fed. Reg. 13198. We do not believe that marketing communications through the centralized source should be limited on the basis of the company that offers the product or service. Instead, provided that the message is not unfair or deceptive and is not provided via a disruptive means, such as "pop-up" ads, the solicitation should be permissible and left to the discretion of participating consumer reporting agencies. We also believe that the final rule should include affirmative examples of permissible actions.

**Question Set 9.  Fraudulent Websites & Improper Report Requests.**  Primary responsibility for preventing the establishment of fraudulent "centralized source" websites and telephone numbers should be the responsibility of the Commission and law enforcement.  Discretionary enforcement authority, however, including the ability to seek injunctive relief, could be afforded to the centralized source and/or participating consumer reporting agencies.

The Proposed Rule should also be revised to give the centralized source and participating consumer reporting agencies the ability to take steps to decline requests funneled to the centralized source through third party entities, such as credit repair clinics.  This should include the ability to refuse to accept high quantities of requests from the same IP or e-mail addresses.

**Question Set 10.  Competitive Concerns.**  *What competitive concerns may be raised by the operation of the centralized source and/or other provisions of the proposed rule? How might the final rule address these concerns?*

Section 610.2(b) of the Proposed Rule would require participating consumer reporting agencies to jointly "design, fund, implement, maintain, and operate" the centralized source.  Such a requirement, by its very nature, requires participating consumer reporting agencies to work in close concert with respect to this mandate.  The final rule should make clear that such coordination is not subject to anti-trust enforcement as it relates to the operation of the centralized source.  We note that the Proposed Rule

already prohibits participating consumer reporting agencies from barring new entrants meeting statutory requirements from participating in the centralized source, making the use of anti-trust laws for such purposes unnecessary.

**Question Set 11. Geographic Roll-out.** *Is the geographic roll-out scheme for the centralized source during the transition period, described in section 610.2(i)(1) of the Proposed Rule appropriate to protect the interests of both industry and consumers and to ensure an orderly phase-in of the free annual file disclosures requirement?*

While we believe that it is very important to stagger the timing of consumer requests for free annual file disclosures, both during the transition and as part of the permanent centralized source system, we are concerned that basing this staggering on geography will work to exacerbate demands on the centralized source through artificial demand driven by media and advocacy group efforts.

Other means of segmenting the population such as a birth-month system could be readily explained to consumers without the potential drawbacks of the geographic system. Birth month is also static, which makes it preferable to geography in a permanent staggering system.

Regardless of the segmentation method ultimately adopted, however, we believe that the most important considerations are that the staggering is permanent and that the rollout is done gradually over the course of two years to allow centralized source

participants to properly design, implement and build the capacity of the centralized source.

**Question Set 16. Standardized form.**

We have commented at length on the contents of the proposed standardized form in the main body of our submission.

**Question Set 17. "Substantially nationwide" consumer reporting agencies.**

This question set poses a series of questions about the possible exercise of the Commission's authority to require consumer reporting agencies that it recognizes as being "substantially nationwide" in character.  We believe that it is important for the Commission to exercise this authority in the final rule.

We believe that there are two types of substantially nationwide consumer reporting agencies.  First, associated consumer reporting agencies as contemplated in the Proposed Rule are properly characterized as substantially nationwide in scope as a result of their participation in a nationwide consumer reporting system.  Second, there may be substantially nationwide consumer reporting agencies, now or in the future, that act independently of national consumer reporting systems.

We note that some associated consumer reporting agencies, in addition to their participation in national systems are quite large in their own right. Some associated consumer reporting agencies own over forty million credit files on consumers residing in nearly a third of the states. It is difficult to see how such an agency is not substantially nationwide in character. Failure to designate consumer reporting agencies with such a large geographic scope and such a large number of files as being "substantially nationwide" could unnecessarily deprive consumers of potentially significant file disclosures.

While there would clearly be costs, perhaps significant costs, to a consumer reporting agency designated as being "substantially nationwide," such designations would avoid the numerous problems, addressed in the main body of our submission, which are posed by the Commission's current proposal.

Respectfully submitted,

Kent E. Mast
General Counsel
Equifax Information Services LLC