FILED

2011 Sep-22  AM 10:10
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

COREY SINGLETERY, individually and     )
on behalf of a class of similarly situated     )
persons,     )
    )
       Plaintiff,     )
    )
vs.     )      Case No. 2:09-cv-489-TMP
    )
EQUIFAX INFORMATION     )
SERVICES, LLC.,     )
    )
       Defendant.     )

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

    This cause is before the court on the defendant's motion for summary judgment with respect to the individual claims asserted by plaintiff Corey Singletery, filed February 25, 2011, (Doc. 119), as well as the plaintiff's motion for certification of a class of plaintiffs, which was filed on January 21, 2011.  (Doc. 94).  Both motions have been thoroughly briefed and are under submission. The parties have not consented to the exercise of dispositive jurisdiction by the undersigned magistrate judge; thus, this report and recommendation is submitted to the court with respect to both motions.

I.  Procedural History

    Plaintiff filed his complaint in this action on March 12, 2009, alleging on behalf of himself and a class of similarly situated individuals, a claim against defendant Equifax Information Services, LLC, ("Equifax") under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*.  The complaint alleges that § 1681j(a)(1)(A) requires credit reporting agencies, including Equifax, to make one annual disclosure of a consumer's credit file, upon request of the consumer, free of charge,

within 15 days after the consumer's request.  Additionally, a consumer may request a free disclosure from a credit reporting agency within 60 days after receiving notice of an adverse credit action, such as a denial of credit, where information supplied by the credit reporting agency was involved in the adverse action.  Failure of a credit reporting agency to make a disclosure after a proper request from a consumer gives rise to a private cause of action on behalf of the requesting consumer for either a willful noncompliance with the statute under § 1681n or a negligent non-compliance under § 1681o.[1] A successful plaintiff can recover for each willful failure to disclose actual damages caused by the failure, or statutory damages of not less than $100 or more than $1,000, plus punitive damages, attorney's fees, and the costs of the action.  15 U.S.C. § 1681n(a).  The complaint alleges simply that, within the statutory period, plaintiff requested both a free annual credit report and a report following an adverse action, both of which Equifax willfully failed to disclose to him.  Plaintiff also alleges that Equifax has done so with respect to similarly situated individuals, and he seeks the certification of two classes: one composed of consumers denied a free annual credit report by Equifax, and a second composed of consumers denied a free credit report by Equifax after receiving notification of an adverse credit action.

On May 21, 2010, plaintiff filed an amended complaint, in which he alleged more factual details concerning his efforts to obtain a credit file disclosure from Equifax following a denial of credit in May 2008.  The amended complaint also quoted extensively from complaints filed with the Federal Trade Commission by consumers experiencing problems with obtaining free disclosures from Equifax.  (Doc. 47).

---

[1] In response to the defendant's motion for summary judgment, plaintiff explicitly withdrew his claim for negligent non-compliance.  Thus, the only theory before the court is the defendant's alleged willful non-compliance.  See Doc. 139, p. 3.

Upon filing its motion for summary judgment, Equifax filed a Unified Statement of Facts both in support of its motion for summary judgment and in opposition to the plaintiff's motion for class certification.   Document 121 in the court's electronic docket sheet is a version in which personal identifier information, such as addresses and account numbers, has been redacted.   An unredacted version of the Unified Statement of Facts has been filed under seal with the court and is available in the record.

## II.  <u>Summary Judgment Standards</u>

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  <u>Celotex</u>, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  <u>Id</u>. at 323.

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories,

and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id.
at 324 (quoting former Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in
a form necessary for admission at trial; however, he may not merely rest on his pleadings.  Celotex,
477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after
adequate time for discovery and upon motion, against a party who fails to make a showing sufficient
to establish the existence of an element essential to that party's case, and on which that party will
bear the burden of proof at trial."  Id. at 322.

        After the plaintiff has properly responded to a proper motion for summary judgment, the
court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is
entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The substantive law will identify
which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict
for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence
and determine the truth of the matter but to determine whether there is a genuine issue for trial."
Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence
presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that
one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc.
v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than
show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co.,
Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The evidence supporting a claim must be
"substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a
mere scintilla of evidence is not enough to create a genuine issue of fact.  Young v. City of Palm

Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-1250 (11th Cir. 2004).  If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination.  See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

On December 1, 2010, Rule 56(c) of the Federal Rules of Civil Procedure was amended to establish certain minimum procedures for presenting, supporting, and opposing a motion for summary judgment.  That provision states in part the following:

**(c) Procedures.**

　　　**(1) Supporting Factual Positions.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

　　　　　(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

　　　　　(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

　　　**(2) Objection That a Fact Is Not Supported by Admissible Evidence.**  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

　　　**(3) Materials Not Cited.**  The court need consider only the cited materials, but it may consider other materials in the record.

Consistent with this procedure, Equifax filed a Unified Statement of Facts, setting out what it viewed as the undisputed facts in the case and citing to the evidentiary source of each fact.  In his opposition to the motion for summary judgment, plaintiff indicated those parts of the Unified Statement of Fact he disputes,[2] also citing to the evidentiary source he asserts supports his view of a disputed fact. Insofar as the parties appear to agree that many of the facts outlined in the Unified Statement of Facts are not disputed, the court has drawn its own statement of the facts from this source, always keeping in mind that disputed facts must be viewed favorably to the non-moving plaintiff.

_____

　　　[2]  The footnote at page three of the plaintiff's opposition to summary judgment clearly states that plaintiff disputed only certain of the statements of fact contained in defendant's Unified Statement of Facts, leaving the remaining statements undisputed.  See Doc. 139, p. 3 note 1.

### III.  Undisputed Facts

Applying these standards to the evidence before the court, and viewing the evidence and reasonable inferences from the evidence favorably to the non-moving plaintiff for purposes of summary judgment, the following facts are relevant to the motion before the court.

Equifax is a consumer reporting agency, which gathers information about consumers from various sources and uses it to create credit files on more than 200 million consumers in the United States.  Equifax assembles that information into consumer reports and sells those reports to subscribers who have a permissible purpose under the FCRA for obtaining consumer credit information.  Under certain circumstances, Equifax also provides consumers with free credit-file disclosures, which are commonly referred to as "credit reports."  Plaintiff is a 25 year-old high school graduate who has lived with his parents for most of his life.  Plaintiff suffers from attention deficit hyperactivity disorder ("ADHD") and has difficulty comprehending sentences and conversations, reading, and writing.

Beginning in 2004, as mandated by the FACT Act, Equifax joined with the other two national credit-reporting agencies, Experian and Trans Union, to set up a central contact point through which consumers may request a free annual credit disclosure from each or all of the credit-reporting agencies.  A corporation known as Central Source LLC was created jointly (and is jointly owned) by the three national credit-reporting agencies to receive consumer requests for free annual disclosures, and these requests are received via a website, a telephonic Voice Response Unit (VRU), and through the mail.  When Central Source receives a consumer request, it forwards the request to the appropriate credit-reporting agency.  To fill these requests, Equifax has outsourced the work to two entities, Direct Data Capture ("DDC") and Intellinet.  DDC is located in Atlanta, with an

affiliate in the Philippines.  Pursuant to an outsourcing agreement, all web-based, telephonic, and written requests for a free annual disclosure from Equifax were processed by DDC-Philippines employees.  The contract between Equifax and DDC-Philippines set certain performance standards generally requiring DDC-Philippines to process requests for free annual disclosures within 24 to 48 hours with a 90% accuracy rate.  All employees of DDC-Philippines were trained in Equifax policies relating to filling requests for free annual disclosures, and each employee was rated or graded on his or her performance under those standards.  The work of DDC-Philippines employees also was audited by a quality assurance auditor required to examine at least 1% of the transactions processed by each employee every two weeks.  A failure by DDC-Philippines to achieve the 90% accuracy rate, or otherwise comply with Equifax requirements, could result in Equifax reducing the contract fees it owed to DDC-Philippines for its services, or even cancellation of the contract with DDC-Philippines.  In months when accuracy rates reach 100%, DDC was entitled to a bonus from Equifax.

Although Central Source was established to receive consumer requests for free annual disclosures, any requests following an "adverse action" were also forwarded to the respective credit-reporting agencies.  Central Source also forwarded to the appropriate credit-reporting agency any consumer "complaints" received, which could include complaints by consumers who had not received disclosures requested by them.

Equifax had no information regarding plaintiff in its consumer database prior to April 2005.  Plaintiff's Equifax credit file was created on or about April 7, 2005, to store an inquiry made by Wachovia Bank.  Wachovia identified the consumer as Corey Singletery and provided an address of "116 English KN, Birmingham, Alabama 35235."  The initial information in the file, including the name and address, came entirely from Wachovia Bank, but additional information was added at

various times later.  In 2007 and 2008, five inquiries from creditors (requests for credit reports) were made on plaintiff's credit file.  To make an inquiry regarding a consumer, the creditor must enter identifying information into Equifax's system, such as the consumer's name, address, and/or Social Security number.  Two creditors who made inquiries in June 2007 listed plaintiff's address as "1167 English Kn," Birmingham, Alabama, and the remaining 2007 and 2008 inquiries listed plaintiff's address as "1667 English KN," Birmingham, Alabama.  Equifax generally obtains consumer addresses from furnishers of information, which report credit information about consumers to Equifax.  A furnisher of information may be a bank, credit card company, loan company, debt collector, or other types of creditors/lenders that extend credit to consumers.  After the creation of plaintiff's credit file in April 2005, furnishers and other creditors that made inquiries about plaintiff's credit file reported the address information each creditor had on file regarding plaintiff to Equifax.  A consumer's credit file is not updated based on information contained in an inquiry by a creditor.  Thus, if an address given for a consumer in a creditor inquiry is different from that in the consumer's credit file, the file will not be updated with the address listed in the consumer's inquiry.  In this case, the address of "116 English KN" for plaintiff was not updated or changed between the time of his file's creation in 2005 and early 2009.

In May 2008, plaintiff applied for credit at a retail electronics store, HHGregg.  The store's credit accounts were serviced by GE Money Bank (also referred to as GE Consumer Finance), which made an inquiry about the plaintiff's consumer credit file on May 9, 2008.  That same day, May 9, 2008, the creditor informed plaintiff that credit would be denied.  The creditor later notified plaintiff in writing that the credit denial was based in part on information supplied by Equifax, and it further advised him how he could obtain a copy of his credit file from Equifax, giving plaintiff a 1-800

9

number to contact Equifax.  The 1-800 number was a dedicated line for receiving requests for disclosures following "adverse actions," and that number was supplied to creditors for use when the creditor denied credit or otherwise took "adverse action" with regard to a consumer's credit.  The "adverse action" toll-free number is different from the Central Source number because Central Source was set up under the FACT Act to comply with the congressional mandate that the credit-reporting agencies provide a central contact point for consumers seeking a free annual disclosure.  Central Source was not set up to take and process "adverse action" requests for disclosure, and there is a separate toll-free number given to consumers in "adverse action" letters for making those requests.

GE Money Bank gave plaintiff notice of the denial of credit and his right to seek a copy of his credit file from Equifax in a letter dated May 9, 2008.  Although plaintiff does not personally remember the letter, he believes his father received it, opened it, and later explained it to him.  (Depo of Corey Singletery, Doc. 98-15, pp. 39-41).  Because plaintiff's Attention Deficit Hyperactivity Disorder ("ADHD") makes it difficult for him to process information quickly, he authorized his father to conduct certain business for him, including contacting Equifax and other credit reporting agencies after receiving the letter from GE Money Bank.  (Id. at pp. 38-42).  Plaintiff authorized his father to make inquiries for him concerning a free annual credit disclosure from Equifax.  (Id. at pp. 49-51).  Plaintiff himself never personally contacted Equifax, and he has no knowledge of how, when, or by what means his father may have requested a free annual credit disclosure on his behalf.  (Id. at pp. 53-54).  After discussing it with his father, it was plaintiff's father who made the actual decision to request the free annual disclosure.  (Id.).  There is testimony in the record that plaintiff did attempt to call a 1-800 number for Equifax, but hung up in frustration.  Plaintiff's father testified

that he first called the 1-800 number listed in the GE Money Bank declination latter (see James Singletery Depo., Doc. 127, pp. 172-173), during which he a got a recording asking for identification information for the person making the request.  Plaintiff's father supplied the information (either by speaking it into the telephone or by pressing buttons on the telephone number pad).  Thereafter, he and plaintiff expected to receive a credit report.  When no credit report arrive, plaintiff's father contacted a local office of the Federal Trade Commissions and was given a telephone number to contact Equifax.  Apparently this number was the 1-800 number for Central Source.

The 1-800 number called by plaintiff's father on or about May 24, 2008, was the Central Source number through which consumers call to request a free annual credit disclosure from any or all three of the nation credit reporting agencies, Equifax, Experian, and Trans Union.  The number was not the dedicated line for receiving "adverse action" requests for disclosure that was listed in the GE Money Bank letter. After making the call, plaintiff received credit reports from Trans Union and Experian, although these came more than 15 days following the request, but he did not receive a disclosure from Equifax.  Other than the initial call to the dedicated "adverse action" number, there is no evidence that either plaintiff or his father ever told Equifax that GE Money Bank had denied plaintiff credit, or that plaintiff was seeking a disclosure due to the "adverse action" of the credit denial.  Their dealings with Equifax after May 24, 2008, were either in written letters or through the Central Source number.

Soon after the May 24 telephone call, plaintiff or his father received a letter from Equifax dated May 25, 2008, that acknowledged his request for a free annual credit disclosure, (see Declaration of Alicia Fluellen, Ex. B-3, Doc. 123, p. 23); however, the letter requested that plaintiff supply additional identification information.  This letter was mailed by DDC-Philippines employee

Melissa Oray.[3]  The letter was mailed because the address for the plaintiff given during his request

for a disclosure did not match the address on the credit file,[4] thus requiring further identification to

assure that the person requesting the disclosure was the consumer himself.   The additional

identification required by the letter included at least one form of documentation of the plaintiff's

Social Security number and another form of documentation containing plaintiff's then-current

mailing address of 1667 English Knoll Ln.[5]

On June 5, 2008, plaintiff or his father mailed to Equifax a copy of his Social Security card

and a copy of his Alabama non-driver identification card, showing his address as 1667 English

Knoll.  (Id., pp. 25-26).  This letter was received by Equifax (and forwarded electronically to DDC-

Philippines) on June 9 or 10, 2008.  Even before the plaintiff's letter was received, however, Equifax

received another telephonic request through Central Source for a free annual disclosure of plaintiff's

credit file.  Because of the discrepancy between the plaintiff's address given in the request and his

address on the credit file, another DDC-Philippines employee, Gladys Abella, sent a second letter

to plaintiff, dated June 6, 2008, requesting the same identification information requested in the

May 25 letter.

The computer system used for responding to requests for disclosure queues the requests for

display to the next available DDC-Philippines agent.  This means that different agents may deal with

---

[3]  Although located in the Philippines, employees of DDC-Philippines were able to review and process requests for disclosure, and direct letters to be mailed from Atlanta, Georgia, through a digital computer system.

[4]  The credit file reflected the original address of 116 English KN for plaintiff given by Wachovia Bank in 2007.  The disclosure request gave his address as 1667 English Knoll.

[5]  The four items that could be used to prove plaintiff's current mailing address were a driver's license, a house deed or rental agreement, a pay stub with address, or a utility bill.

a particular consumer's disclosure request at different times; the request or follow-ups do not stay with the first agent that deals with it.  During 2008, there were approximately 270 Equifax agents and employees responding to requests for disclosure.

When Equifax ultimately received plaintiff's June 5 letter on June 9 or 10, the information in it was sufficient to authorize an Equifax agent to update plaintiff's credit file to correctly reflect his current mailing address as "1667 English KN," rather than the "116 English KN" the file contained.  Equifax agrees that plaintiff should have received his free annual disclosure in response to his June 5 letter.  For some reason, however, the file update did not occur, and on June 11, a DDC-Philippines employee, John Cadiz, mailed yet a third letter to plaintiff directing him to contact Central Source to obtain his free annual disclosure.

Plaintiff's father did so on June 19, 2008, again contacting Central Source telephonically to request plaintiff's free annual disclosure.  This request was again routed to DDC-Philippines for processing, and on June 25, DDC-Philippines employee Mary Boliano mailed plaintiff another letter requesting the same identification information previously requested in the May 25 and June 6 letters. Plaintiff's credit file still was not updated to reflect his current address as "1667 English KN," not "116 English KN."

On July 1, 2008, plaintiff's father handwrote a letter to Equifax, on plaintiff's behalf, again supplying a copy of plaintiff's Social Security card and his Alabama non-driver identification card showing his current address of "1667 English KN."  The letter also included a copy of the June 25 letter from Equifax (DDC-Philippines).  Plaintiff's handwritten letter stated:

To Whom It May Concern:

      I have sent in your request twice, and this is my last time trying to get a copy of my credit report.  If I don't receive a copy very soon, I will do what's necessary legally to obtain my credit report.

                    /S/ Corey Singletery

(See Fluellen Decl., Ex. B-7, Doc. 123).  Equifax received the letter on July 5 and routed it to DDC-Philippines, which again failed to update plaintiff's credit file with the information contained in the letter.  Equifax agrees that the information was sufficient to authorize an agent to update plaintiff's file and make a disclosure to him.  Instead, DDC-Philippines employee Romel Cofuentes mailed a letter to plaintiff on July 8, 2008, directing him, as did the June 11 letter, to the Central Source website to obtain his free annual consumer disclosure.

      Plaintiff complied yet again, when his father telephoned Central Source on his behalf on July 14 to request a free annual disclosure.  Once again, because plaintiff's address in the credit file had not been updated, DDC-Philippines employee Janet Alleto mailed a letter to plaintiff on July 17, 2008, requesting the same identification information previously requested and supplied by plaintiff twice before.  Plaintiff finally received his free annual credit report almost a year later, after this action was filed, on May 27, 2009.

      Between 2007 and January 31, 2011, Equifax fulfilled 43 million requests for consumer credit disclosures, with about 12 million being fulfilled during 2008 alone.  Of the requests actually fulfilled by Equifax, 95% were fulfilled automatically without processing by an employee.  For the time period from March 2007 through March 2009, Central Source received 41,784,337 requests for disclosure of files from Equifax, and during that same 25-month period, Equifax fulfilled 24,418,047

requests, or about 58.44% of the requests received.[6]   In order to forward a request for a free annual credit disclosure to a credit-reporting agency, Central Source requires the following data points to identify the requesting consumer: 1) Social Security number, 2) date of birth, 3) first name, 4) middle name, 5) surname, 6) suffix (e.g., "Jr."), 7) current mailing address, and 8) previous mailing address if the current address is less than two-years old.   Without this information, Central Source will not forward a request for a free annual disclosure to the respective credit-reporting agencies.   Central Source was created in response to the mandate of the FACT Act that the credit-reporting agencies band together to create a "central" portal through which consumers could request free annual disclosures.   Central Source does not process consumer disclosures on requests arising from an "adverse action," it takes only requests for free annual disclosures.   Central Source is jointly owned and operated by all three nationwide credit-reporting agencies: Equifax, Trans Union, and Experian.

Plaintiff's expert, Evan Hendricks, expresses the opinion that Equifax has created a system that intentionally or recklessly makes it difficult for consumers to obtain free consumer disclosures, and that this was done to maximize revenue and profit.[7]   In particular, Hendricks asserts that Equifax's use of an "exact match" protocol for identifying consumers requesting a disclosure

---

[6] These figures are derived from comparing the relevant 25-month period shown for requests to Central Source, shown in Exhibit D to Plaintiff's Evidentiary Support for his motion for class certification (Doc. 98-3), with Exhibit E (Doc. 98-4), which are the fulfillments of requests by Equifax.   Although plaintiff contends the number of fulfillments is overstated because it includes not only free annual disclosures, but also state-required disclosures and "adverse action" disclosures. The evidence indicates that Central Source also received an unknown number of "adverse action" requests, which it forwarded to Equifax.   Thus, while the numbers are not an exact comparison, they are the best available in the record.

[7] While the court credits the factual assertions of the expert, the court disregards his assertion of *legal* conclusions, such as the opinion that defendant acted "recklessly."   An expert may express an opinion on the ultimate issue of *fact*, but may not express ultimate *legal* conclusions.

defaults in favor of denying disclosure, even though Equifax uses a "partial matching algorithm" when searching for a consumer credit file in response to an inquiry from a subscriber creditor. Additionally he contends that Equifax's use of outsourced, low-pay labor to process disclosure requests results in "hyper-compartmentalization" of the process that does not require or even allow agents to investigate and problem-solve minor discrepancies or problems in a consumer's request for disclosure.[8]  The process is like an assembly line, where low-paid employees in the Philippines quickly review disclosure-request information on a computer screen and are given a limited number of choices for processing the request.  Essentially, agents processing a request can make the disclosure if the identify of the requesting consumer is confirmed, or send a form letter requesting additional identification, or decline the request (as, for instance, when it is a second request within twelve months).  Agents can update identification information associated with a consumer file if sufficient documentation is presented, such as that requested in the May 25 and June 6 letters mailed to plaintiff.  Hendricks expresses the opinion, however, that Equifax agents are not properly trained and that there are no quality assurance checks made of their work.

At least 852 consumers have complained to the Federal Trade Commission about various problems they have experienced in obtaining their credit-file disclosures from Equifax.  Other than two of these complaints, it appears that the complaints to the FTC are not forwarded to Equifax. Equifax denies that it has any knowledge of complaints filed with the FTC.  Additionally, Central

---

[8]  Much of the expert report offered by plaintiff is not useful to the particular issues in this case.  While the report is lengthy, it contains clear speculation about Equifax's motives and it discusses problems unrelated to the instant case, such as problems with investigating and correcting consumer disputes concerning the accuracy of information in a consumer's credit file.  There is a long section of the report expounding on credit scores and the purpose of credit reports, which are, at best, only tangentially relevant to this case.  In sum, the expert's report is helpful here only to the extent it identifies the two criticisms of Equifax's system stated above in the text.

Source reports to Equifax and other credit-reporting agencies complaints received from consumers regarding requests for free annual disclosures.  Exhibit C in plaintiff's evidentiary submissions in support of his motion for class certification is a compilation of complaint and error reports from Central Source to Equifax.  The reports break down complaints both by whether Equifax was specifically identified as the agency involved and by the nature of the complaint in the context of web-based requests, VRU-based requests, and mail requests for disclosure.  Looking at the months of March 2008 through September 2008 (the months surrounding the plaintiff's efforts to get his credit report disclosure), the following numbers of complaints specifying Equifax, compared to all complaints, appear:

| | VRU Equifax/All[9] | Mail Equifax/All | Total for Equifax/All[10] |
|---|---|---|---|
| 3/2008 | 93 of 319 (29.1%) | 188 of 488 (38.5%) | 3100 of 9342 (33.2%) |
| 4/2008 | 108 of 369  (29.3%) | 222 of 582 (38.1%) | 3360 of 9233 (36.4%) |
| 5/2008 | 98 of 312  (31.4%) | 202 of 523 (38.6%) | 3045 of 8179 (37.2%) |
| 6/2008 | 133 of 419  (31.7%) | 241 of 561 (42.9%) | 3285 of 8636 (38.0%) |
| 7/2008 | 93 of 359  (25.9%) | 289 of 589 (49.1%) | 3643 of 9222 (39.5%) |
| 8/2008 | 73 of 299  (24.4%) | 259 of 569 (45.5%) | 3191 of 8344 (38.2%) |
| 9/2008 | 94 of 310  (30.3%) | 269 of 592 (45.4%) | 3000 of 8026 (37.4%) |
| Totals | 692 of 2387 (28.99%) | 1670 of 3904 (42.8%) | 22624 of 60982 (37.1%) |

---

[9] The "All" designation includes all complaints made, including those specifying a problem with Equifax, those specifying another agency, and those not specifying any agency as the source of a problem.

[10] The "Total" column lists complaints received for all three methods by which consumers can request disclosure through Central Source: VRU (telephone), mail, and internet.  The much higher numbers of complaints relating to the internet requests for disclosure are due to the fact that the vast majority of requests came in that fashion.  Also, complaints in the internet "channel" included several different kinds of problems, ranging from inability to verify the identity of the requester to problems with printing reports to getting timed out or disconnected from the website.  Because some of these problems arose entirely from computer malfunctions unrelated to Equifax's alleged reluctance to make disclosures, the numbers somewhat overstate the extent of the problems relevant to this case.

<u>Summary Judgment</u>

Plaintiff's amended complaint states four causes of action against defendant:  negligent failure to provide plaintiff with his free annual consumer disclosure, intentional failure to provide a free annual disclosure, negligent failure to provide a requested "adverse action" disclosure, and intentional failure to provide a requested "adverse action" disclosure.  The two claims based upon the alleged negligence of the defendant have been withdrawn by the plaintiff, presumably because he cannot show actual injury or damage, leaving only his two claims for intentional failure to provide requested disclosures.  (<u>See</u> Doc. 139, p. 3).  Defendant makes essentially two arguments in support of its motion for summary judgment on these remaining claims: first, that the plaintiff did not *personally* make a request for either a free annual disclosure or an "adverse action" disclosure, and second, that the evidence simply fails to show the requisite degree of "willfulness"on the part of Equifax to impose liability under § 1681n(a).

The duty of a credit reporting agency to disclose to consumers the contents of their credit files (excluding disclosure of certain types of information) is stated as part of the Fair Credit Reporting Act ("FCRA"), at 15 U.S.C. § 1681g.  "Every consumer reporting agency shall, upon request, and subject to section 1681h(a)(1) of this title, clearly and accurately disclose to the consumer:  (1) All information in the consumer's file at the time of the request...."  The willful failure of a credit-reporting agency to make the disclosure in response to a proper request exposes the agency to potential civil liability under § 1681n(a), which states:

> Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of --

18

(1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or

\* \* \*

(2) such amount of punitive damages as the court may allow; and

(3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

But to be a proper request for disclosure, certain conditions apply. First, the request for a "free annual disclosure" must be made through a "centralized source" established by the credit-reporting agencies for the very purpose of receiving such requests. See 15 U.S.C. § 1681j, which states:

**(a)** Free annual disclosure
   **(1)** Nationwide consumer reporting agencies

      **(A)** In general

All consumer reporting agencies described in subsections (p) and (w) of section 1681a of this title shall make all disclosures pursuant to section 1681g of this title once during any 12-month period upon request of the consumer and without charge to the consumer.

      **(B)** Centralized source

Subparagraph (A) shall apply with respect to a consumer reporting agency described in section 1681a(p) of this title only if the request from the consumer is made using the centralized source established for such purpose in accordance with section 211(c) of the Fair and Accurate Credit Transactions Act of 2003.

19

In addition to a "free annual disclosure," a consumer may request disclosure of his file after he has experienced an "adverse action" related to credit, such as the denial of credit.  Section 1681j(b) provides:

> **(b)** Free disclosure after adverse notice to consumer
>
> Each consumer reporting agency that maintains a file on a consumer shall make all disclosures pursuant to section 1681g of this title without charge to the consumer if, not later than 60 days after receipt by such consumer of a notification pursuant to section 1681m of this title, or of a notification from a debt collection agency affiliated with that consumer reporting agency stating that the consumer's credit rating may be or has been adversely affected, the consumer makes a request under section 1681g of this title.

Under either option, however, the credit-reporting agency must require that the requesting consumer properly identify himself in order to reduce the risk of improper disclosure and the attendant risk of identity theft.  Section 1681h(a) provides that, "A consumer reporting agency shall require, as a condition of making the disclosures required under section 1681g, that the consumer furnish proper identification."

In this case, plaintiff alleges that defendant Equifax "willfully" failed to disclose to him his consumer credit file, both after an "adverse action" request for disclosure and after a request for a free annual disclosure.  Because the plaintiff has withdrawn his claims for negligence failure to disclose under § 1681o, he must present evidence of a "willful" failure under § 1681n.  He argues that this willful refusal to comply with Equifax's duty of disclosure can be inferred from several facts: (1) Equifax has a history of opposing congressional action to create a consumers' right to credit file disclosure, (2) Equifax requires an "exact match" of the address of the requesting

consumer with the address in its files (even though it uses a "partial matching algorithm" for producing consumer reports to creditors), (3) Equifax has outsourced its system for responding to consumer disclosure requests to low-paid workers in the Philippines using a "hyper-compartmentalized" system that does not allow workers to investigate or resolve problems with consumer addresses, and (4) a number of complaints have been filed with the FTC and through Central Source concerning consumers having problems getting disclosure from Equifax.

In a slightly different context, the Supreme Court addressed the meaning of "willfulness" under FCRA in the case of Safeco Insurance Co. of America v. Burr, 551 U.S. 47, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007).  In Safeco, the issue concerned the FCRA requirement that consumers subjected to "adverse action" with regard to insurance be notified that such "adverse action" has occurred, and how to contact the credit-reporting agency that provided information leading to the adverse action.  The plaintiffs in that case alleged that the two defendant insurance companies "willfully" failed to make the required disclosures to them.  Defendants argued that a "willful" violation required the plaintiffs to prove a knowing and intentional failure to disclose, but plaintiffs contended that "willful" in the civil context meant reckless disregard of the duty to disclose.

In an opinion authored by Justice Souter, the Supreme Court agreed with the plaintiffs, writing:

> GEICO and Safeco argue that liability under § 1681n(a) for "willfully fail[ing] to comply" with FCRA goes only to acts known to violate the Act, not to reckless disregard of statutory duty, but we think they are wrong.  We have said before that "willfully" is a "word of many meanings whose construction is often dependent on the context in which it appears," Bryan v. United States, 524 U.S. 184, 191, 118 S. Ct. 1939, 141 L. Ed. 2d 197 (1998) (internal quotation marks omitted); and where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well, see

McLaughlin v. Richland Shoe Co., 486 U.S. 128, 132-133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988) ("willful," as used in a limitation provision for actions under the Fair Labor Standards Act, covers claims of reckless violation); Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 125-126, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985) (same, as to a liquidated damages provision of the Age Discrimination in Employment Act of 1967); cf. United States v. Illinois Central R. Co., 303 U.S. 239, 242-243, 58 S. Ct. 533, 82 L. Ed. 773 (1938) ("willfully," as used in a civil penalty provision, includes " 'conduct marked by careless disregard whether or not one has the right so to act' " (quoting United States v. Murdock, 290 U.S. 389, 395, 54 S. Ct. 223, 78 L. Ed. 381 (1933))). This construction reflects common law usage, which treated actions in "reckless disregard" of the law as "willful" violations. See W. Keeton, D. Dobbs, R. Keeton, & D. Owen, PROSSER AND KEETON ON LAW OF TORTS § 34, p. 212 (5th ed.1984) (hereinafter Prosser and Keeton) ("Although efforts have been made to distinguish" the terms "willful," "wanton," and "reckless," "such distinctions have consistently been ignored, and the three terms have been treated as meaning the same thing, or at least as coming out at the same legal exit"). The standard civil usage thus counsels reading the phrase "willfully fails to comply" in § 1681n(a) as reaching reckless FCRA violations,[footnote omitted] and this is so both on the interpretive assumption that Congress knows how we construe statutes and expects us to run true to form, see Commissioner v. Keystone Consol. Industries, Inc., 508 U.S. 152, 159, 113 S. Ct. 2006, 124 L. Ed. 2d 71 (1993), and under the general rule that a common law term in a statute comes with a common law meaning, absent anything pointing another way, Beck v. Prupis, 529 U.S. 494, 500-501, 120 S. Ct. 1608, 146 L. Ed. 2d 561 (2000).

Id. at 56-58.  But reckless conduct is more than mere negligent conduct.  As the Supreme Court explained further:

While "the term recklessness is not self-defining," the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing "an unjustifiably high risk of harm that is either known or so obvious that it should be known." [Footnote omitted].  Farmer v. Brennan, 511 U.S. 825, 836, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); see Prosser and Keeton § 34, at 213-214. The Restatement [(Second) of Torts], for example, defines reckless disregard of a person's physical safety this way:

"The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which

> would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent."  2 <u>Restatement (Second) of Torts</u> § 500, p. 587 (1963-1964).
>
> It is this high risk of harm, objectively assessed, that is the essence of recklessness at common law.  <u>See</u> <u>Prosser and Keeton</u> § 34, at 213 (recklessness requires "a known or obvious risk that was so great as to make it highly probable that harm would follow").
>
> There being no indication that Congress had something different in mind, we have no reason to deviate from the common law understanding in applying the statute. <u>See</u> <u>Prupis</u>, 529 U.S., at 500-501, 120 S. Ct. 1608.  Thus, *a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.*

<u>Id.</u> at 68-69 [italics added].

Applying the standard of recklessness delineated by the Supreme Court, the task before this court is to determine whether plaintiff has come forward with substantial evidence that Equifax failed to make required disclosures to him due to conduct, distinct from mere negligence, involving "an unjustifiably high risk of harm that is either known or so obvious that it should be known." Equifax is liable for a "willful" violation of § 1681n(a) only if its conduct "ran a risk of violating the law substantially greater than the risk associated with... mere[] careless[ness]."  For the reasons explained below, the court believes that the undisputed evidence fails to show such recklessness and that the plaintiff is not able to show a "willful" violation of FCRA.

At the outset, the undisputed evidence viewed from the perspective of the plaintiff establishes that he attempted to request an "adverse action" disclosure in the days following the letter he

received from GE Money Bank in early May 2008.  He testified that he attempted to call the 1-800 telephone number given for Equifax in the letter, but hung up out of frustration.  His father testified that he too attempted to the call the 1-800 number but got only a recording.  Thereafter, plaintiff's father contacted the FTC and got a different number for Equifax, which turned out to be the 1-800 number at Central Source for making a request for a free annual disclosure rather than a request for an "adverse action" disclosure.  The confusion that ensued thereafter, while involving an admitted negligent human failure on the part of Equifax's DDC-Philippines agents,[11] did not involve a reckless disregard of its duty to make a disclosure to plaintiff.

As discussed earlier, plaintiff contends that there is a constellation of facts from which Equifax's reckless disregard of its statutory duty to make requested disclosures can be inferred.  The court disagrees that these facts create a genuine issue with regard to whether Equifax engaged in objectively unreasonable conduct involving an unjustifiably higher risk of non-compliance than mere carelessness.  First, the mere fact that Equifax opposed congressional efforts to pass the FACT Act several years ago says nothing about its present intent to comply with federal law.  Contrary to the assertion that this prior opposition allows one to infer continuing opposition to disclosure, the undisputed evidence shows that Equifax has expended time, effort, and money to comply with the FCRA mandate.  It helped set up Central Source, and continues to play its role in its continuing operation.  Equifax has contracted with a number of service providers (DDC-Atlanta, DDC-Philippines, and Intellinet) to help receive and process consumer requests for disclosure, and it has expended time, effort, and money to train and audit these agents.  While plaintiff points to four

---

[11]  Equifax admits that, at two points in time, its DDC-Philippines agents should have updated the address information for the plaintiff in the credit file based on documents he sent them, and then made a disclosure to him.  That the agents did not may been negligent, but not reckless.

months in 2008 (March, April, May, and June) when DDC-Philippines' quality assurance standard fell below the 90% mark required by its contract with Equifax, this also means that the vast majority of months DDC-Philippines agents processed requests for disclosure between 2005 and 2010, an accuracy rate of 90% was achieved.  Certainly, this demonstrates a good-faith effort by Equifax to assure the greatest accuracy possible when dealing with tens of millions of consumer requests.

Plaintiff also points to complaints filed by consumers, both with the FTC and through Central Source, complaining about problems getting their requested disclosures.  But even assuming all 852 complaints filed with the FTC reflect actual failures by Equifax to respond to a proper request,[12] this is a minuscule number in light of the tens of millions of requests made.  It is undisputed that Equifax has fulfilled more than 40 million requests for free annual disclosures, 12 million in 2008 alone, the year plaintiff sought his disclosures.  The fact that 852 consumers out of tens of millions encountered problems cannot support an inference that Equifax is reckless with regard to its duty to make disclosures.[13]  Given the overwhelming number of requests made, it is certain that mistakes will occur, but this does not prove that Equifax was reckless.

The same is true of the complaints made by consumers to Central Source.  Comparatively speaking, the number of complaints made was tiny.  Moreover, as indicated by the months of March through September 2008 outlined above, the *rate* error or number of complaints specifying Equifax was not disproportionate to the other two credit-reporting agencies comprising Central Source.  Of

---

[12]   We do not know whether any of the 852 complaints to the FTC actually involved a "proper" request complying with all conditions for disclosure under the Act.  Because the complaints were not given to Equifax by the FTC, there is no evidence showing that Equifax received a "proper" request in every instance.

[13]   The 852 complaints filed with the FTC represents a mere .00213% of the 40 million fulfilled and an even much smaller portion of the requests made.

the complaints made to Central Source for those months, 33% to 39%, or about one-third, specified Equifax as the problem.  Because Central Source receives requests for disclosure, and complaints, for all three national credit-reporting agencies, the fact that Equifax had about one-third suggests that it was no more or less reckless responding to requests for disclosure than the other two agencies. Again, one cannot infer from this evidence that Equifax recklessly disregarded its duty to make disclosures, as distinct from experiencing the same problems experienced by the other credit-reporting agencies due to the tens of millions of requests received.  The point is not that mistakes were not made, but that the mistakes were not the product of a recklessness on the part of Equifax.

The facts of plaintiff's own experience attempting to request disclosures are illustrative. When plaintiff requested his "adverse action" disclosure in May 2008, the Equifax credit file for him showed a different address than that given during the request.  Equifax had plaintiff's address as "116 English Knoll," not 1667 English Knoll.  Indeed, even before plaintiff's request, there had been requests for credit files by creditors that listed yet another address for plaintiff, "1167 English Knoll."  Given the statutory mandate that a requesting consumer provide proper identification, it is not surprising that Equifax would seek additional information to assure that the request was indeed coming from the plaintiff.

After plaintiff and his father first made calls to the 1-800 number listed in the GE Money Bank "adverse action" letter, they shifted to another avenue and another type of request.  After contacting the FTC, they began calling the Central Source 1-800 number, which was set up for free annual disclosures, not "adverse action" disclosures.  Again, the address mismatch prompted Equifax to send a letter on May 24 requesting documentation confirming plaintiff's address.  Plaintiff responded by sending a copy of his Social Security card and Alabama identification card to Equifax

in a letter dated June 5. The next day, June 6, before Equifax received the plaintiff's letter, plaintiff or his father made another telephonic request through Central Source. This prompted yet another letter requesting additional information. It must be borne in mind, however, that the June 6 letter was sent before Equifax knew anything about the plaintiff's June 5 letter, which Equifax received on June 9 or 10. As of June 6, the address discrepancy had not yet been corrected.

When Equifax received the plaintiff's letter on June 9 or 10, it should have been sufficient to prompt correction of the address in plaintiff's credit file, but for reasons not known, DDC-Philippines employee John Cadiz did not make the correction, and instead mailed a letter to plaintiff on June 11 directing him to contact Central Source to obtain a free annual disclosure. Plaintiff's father then called Central Source again on June 19, and this call prompted another DDC-Philippines employee, Mary Boliano, to mail the June 25 letter, requesting additional confirmation of plaintiff's address. But for the error of John Cadiz in failing to update plaintiff's address, the telephone call to Central Source on June 19 should have resulted in a disclosure to plaintiff.

Plaintiff responded to the June 25 letter, mailing a letter on July 1 containing a copy of his Social Security card, Alabama identification card, and the June 25 letter. Equifax received the letter on July 5, and on July 8, DDC-Philippines employee Romel Cofuentes mailed a letter to plaintiff directing him to the Central Source website to obtain his free annual consumer disclosure. Equifax agrees that plaintiff's July 1 letter and enclosures also should have prompted correction of the address in plaintiff's credit file, but again it was not corrected. When plaintiff's father called Central Source again on July 14, the request was routed to DDC-Philippines employee Mary Alleto, who, noting the address discrepancy, mailed a July 17 letter requesting information confirming plaintiff's address.

27

It is true that, twice, plaintiff supplied sufficient information to allow Equifax and its agents to correct the address discrepancy in plaintiff's credit file, yet it was not corrected. While this might establish negligence, it is not substantial proof that Equifax recklessly disregards the duty to respond to disclosure requests. Plaintiff's particular experience certainly became a bureaucratic nightmare, as he responded time and again to requests for additional identification information, only to have it go unheeded repeatedly. But human error is an all too frequent and expected occurrence. One cannot draw from this particular snafu a conclusion that Equifax put this system in place with reckless disregard for providing requested disclosures.

Plaintiff contends that Equifax's insistence on an "exact match" between the address a consumer gives in making a request and the address in the consumer's credit file shows that Equifax is resistant to giving disclosures. He points out that creditors seeking production of a credit report on a consumer need only give Equifax a name and an address, and that Equifax can match the address using a "partial matching algorithm." But the purposes of the two requests for information, and the risks inherent in them, are different and justify different standards for matching addresses. When a subscriber-creditor asks Equifax for a credit report on a consumer, it is not unusual for that consumer to have multiple addresses over time, yet the creditor still needs that historical information to make a credit-worthiness assessment. Moreover, the risk that consumer information will be misused when requested by a creditor is less because the requester is a known subscriber of the credit-reporting agency. When a request is made for a free annual disclosure, however, the requester is not necessarily known to Equifax, and § 1681h mandates that Equifax take reasonable steps to require the requester to identify himself as the consumer whose credit file is being requested. The need to assure that such a requester is the proper person is much greater than when a creditor

requests a credit file because the risk of identity theft is much greater.  While a "partial matching algorithm" fulfils the need of a creditor to get all credit information concerning a consumer it is considering for credit, an "exact match" of the requester's address with that shown for the consumer in the credit file operates to deter identity thieves seeking an improper disclosure of a consumer's credit file.  It is a reasonable security measure — indeed, one most consumers would expect — for Equifax to confirm that the address given by the requester matches the consumer's known address, or, alternatively, that the requester prove that the address is the proper one for the consumer. Otherwise, it is easier for identity thieves to obtain disclosure of a consumer's credit file with only a partial matching address.  When Equifax confirms the address is the consumer's current address, the risk that the disclosure will be mistakenly mailed to someone other than the consumer is reduced. For this reason, the court cannot infer that Equifax's use of an "exact match" protocol for consumer disclosure requests, but not creditor requests for a consumer's credit report, suggests any reckless disregard for the right to the consumer to receive the disclosure.  Rather, it is consistent with a duty to reasonably protect the consumer from an improper disclosure.

Likewise, the fact that Equifax outsourced the processing of consumer requests for disclosure does not support an inference of recklessness.  The evidence shows that millions of requests for disclosures are made every year, and the credit-reporting agency is required to respond to each request within 15 days after receipt.  Equifax's organizational goal was to respond to each within 24 to 48 hours.  Plainly, this requires a streamlined and efficient system enabling workers to process more than 23,000 requests every day.[14]  Such numbers require a system that allows workers

---

[14]  From March 2007 through March 2009, Central Source received 41,784,337 requests for disclosures by Equifax, and during that same 25-month period, Equifax fulfilled 24,418,047 requests, or about 58.44% of the requests received.  Thus, on average, Equifax received over 1,671,000

to make simple, quick decisions regarding processing, and inevitably this leads to human error.  But human error alone does not show that the system is so flawed that one can reasonably infer that Equifax is reckless in fulfilling its disclosure duty.  Equifax has presented undisputed evidence that it trained the workers employed to perform the processing,[15] and that it audits the accuracy of their work on two separate levels within the organization.  An auditor is responsible for auditing at least 1% of each worker's transactions every two weeks, and the reports of each auditor are themselves audited at a higher level within Equifax's organization.  Equifax's contract with DDC-Philippines required a 90% accuracy rate, which was, in fact, achieved in all but four months over a multi-year period.  While Equifax's processing system is far from perfect, no reasonable inference can be drawn that it involved "a risk of violating the law substantially greater than the risk associated with" mere carelessness.

In sum, therefore, the collection of facts noted by plaintiff simply does not support a reasonable inference of recklessness, necessary to show a "willful" non-compliance by Equifax of its duty to make disclosures to plaintiff.  Although it is true that plaintiff did not receive a timely disclosure for either an "adverse action" request or a free annual request, the question is whether that failure was due to something more than mere negligence.  Human errors generally do not establish recklessness, unless those errors are so prevalent and continuous that a reasonable inference can be

---

requests each month, and fulfilled an average of 976,000 each month.  Since 95% of the fulfilled requests were processed automatically by computer, this suggests that the difference between the total requests and the fulfillments processed by computer (about 695,000) had to be processed manually each month, for an average of over 23,000 each day.  Of course, there is no evidence about whether the unfulfilled requests were "proper" in the sense of having the right name, address, and other identifiers necessary for Equifax to properly identify the requester.

[15]  Each DDC-Philippines worker received two weeks of formal training and several days of working with a "coach."

drawn that Equifax was not interested in correcting the errors and, thus, recklessly disregards its duty to disclose a consumer file upon a proper request.  Here, a discrepancy in the plaintiff's address caused Equifax to seek additional confirmation of the plaintiff's identity, and simple human error prevented that discrepancy from being corrected in a timely fashion.  But that simple human error does not support the inference that Equifax recklessly did not care whether consumer disclosures were properly made.  Because plaintiff cannot show the existence of a genuine issue of material fact concerning any "unjustifiably high risk" of non-compliance by Equifax, defendant is entitled to judgment as a matter of law.

Class Certification

Having concluded that defendant is entitled to summary judgment on plaintiff's individual claim, it may seem obvious that plaintiff is not an adequate representative of the classes for which he seeks certification.  See Stuart v. Ingalls Shipbuilding, Inc., 163 F.3d 1356 (5th Cir. 1998)("If summary judgment on the claims of the individual plaintiffs is upheld, the court need not address the issue of class certification because the proposed representatives would not be able to represent the putative class adequately.").  But the law in the Eleventh Circuit is different.  The mere fact that summary judgment is granted against the named plaintiff's individual claims does not "*ipso facto*" mean that he is not an adequate class representative.  As the court of appeals has stated:

> The district court erred in failing to address the [class certification] issue.  The court apparently thought that its decision granting Champion summary judgment on the employer issue automatically disposed of the class certification issue.  That is, having lost their cases on the merits, the named plaintiffs would be unable as a matter of law to represent the class.  The court was incorrect.  The law of this circuit is to the contrary: a plaintiff's capacity to act as representative of the class is not ipso facto

31

terminated when he loses his case on the merits. See Satterwhite v. City of Greenville, 634 F.2d 231 (5th Cir. Jan. 1981) (en banc); [footnote omitted] Armour v. City of Anniston, 654 F.2d 382 (5th Cir. Unit B Aug. 1981) (per curiam); see also Armstrong v. Martin Marietta Corp., 138 F.3d 1374, 1383 n. 16 (11th Cir. 1998) (en banc) (noting that in some cases the named plaintiff may appeal a denial of class certification even if she ceases individually to have a controversy with the defendant). Consequently, even after finding against plaintiffs on the merits, the court should have determined whether the class action could be maintained, and whether the plaintiffs could represent that class.

Martinez-Mendoza v. Champion Intern. Corp., 340 F.3d 1200, 1215-1216 (11th Cir. 2003). Thus, notwithstanding the recommended grant of summary judgment against the named plaintiff, the court is required to continue to consider the motion for class certification. But, for the reasons explained below, the classes sought by plaintiff cannot be certified.

The requirements for class certification are well understood under Rule 23 of the Federal Rules of Civil Procedure. The Eleventh Circuit has summarized them thusly:

> Rule 23(a) sets out four requirements which must be satisfied before a class can be certified. The Rule states:
>
>> (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.
>
> Id. These four requirements commonly are referred to as "the prerequisites of numerosity, commonality, typicality, and adequacy of representation," and they are designed to limit class claims to those "fairly encompassed" by the named plaintiffs' individual claims. Gen. Tel. Co. of S.W. v. Falcon, 457 U.S. 147, 156, 102 S. Ct. 2364, 2370, 72 L. Ed. 2d 740 (1982) (quoting Gen. Tel. Co. of N.W. v. E.E.O.C., 446 U.S. 318, 330, 100 S. Ct. 1698, 1706, 64 L. Ed. 2d 319 (1980)). Typicality, along

with the related requirement of commonality, focuses on whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification.  See Washington v. Brown & Williamson Tobacco Corp., 959 F.2d 1566, 1569 n. 8 (11th Cir. 1992); see also 7A C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1764 (1986). Traditionally, commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the named plaintiff in relation to the class.  See Prado-Steiman v. Bush, 221 F.3d 1266, 1279 (11th Cir. 2000).  Typicality also encompasses the question of the named plaintiff's standing, for "[w]ithout individual standing to raise a legal claim, a named representative does not have the requisite typicality to raise the same claim on behalf of a class."  Id. "Adequacy of representation" means that the class representative has common interests with unnamed class members and will vigorously prosecute the interests of the class through qualified counsel.  Andrews, 95 F.3d at 1023.  These four requirements "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  Prado-Steiman, 221 F.3d at 1279 (quoting Falcon, 457 U.S. at 157, n. 13, 102 S. Ct. at 2370).

In addition to the requirements of Rule 23(a), before a class can be certified, at least one of the alternative requirements of Rule 23(b) must be satisfied.  Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1005 (11th Cir. 1997).   The alternative requirements provided by Rule 23(b) are as follows:

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
>
> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
>
> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Piazza v. Ebsco Industries, Inc., 273 F.3d 1341, 1346-1348 (11th Cir. 2001).  The district court must conduct a "rigorous analysis" of the evidence to determine whether the requirements of Rule 23 are met.  See Wal-Mart Stores, Inc. v. Dukes, ___ U.S. ___, 131 S. Ct. 2541, 2251, 180 L. Ed. 2d 374 (2011); Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1266 (11th Cir. 2009) citing Castano v. American Tobacco Co., 84 F.3d 734, 740 (5th Cir. 1996); Martinez-Mendoza v. Champion International Corp., 340 F.3d 1200, 1216 n. 37 (11th Cir. 2003).  The burden of proving the propriety of class certification is on the proponent of the class.  Id. at 1265.  Conducting this rigorous analysis, the court concludes that plaintiff cannot prove the requirements for class certification.

Beginning first with the basic requirements listed in Rule 23(a) — numerosity, commonality, typicality, and adequacy — there are serious problems with each requirement, except numerosity. The court is willing to assume that each of the two classes proposed by plaintiff — a class of consumers who have requested but been willfully denied their "free annual disclosure" by Equifax, and a separate class of consumers who have requested but been willfully denied an "adverse action" disclosure by Equifax — are sufficiently large to meet the numerosity requirement.  In the Eleventh

Circuit, it is generally assumed that a class of more than forty members fulfills the numerosity requirement.  See Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1267 (11th Cir. 2009) citing Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1553 (11th Cir. 1986) (citing 3B MOORE'S FED. PRACTICE & PROCEDURE ¶ 23.05[1] at n. 7 (1978)).  In this case, the proposed classes number in the hundreds of thousands, if not millions.

The court finds problems with the commonality, typicality, and adequacy requirements, however.  First, "commonality," as it is set out in Rule 23(a) requires only that there exist common issues of fact or law among the class members.  The Rule 23(a) commonality requirement is distinct from the additional, more onerous requirement in Rule 23(b)(3) that common issues "predominate" over individual issues.  Nonetheless, even on the lighter Rule 23(a) commonality requirement, the plaintiff has a fundamental difficulty.  The classes he proposes to certify break down simply along the grounds of whether the consumer's request was for a "free annual disclosure" or an "adverse action" disclosure, but there are many more individual issues that arise within each class. Commonality under Rule 23 requires more than simply saying that each consumer requested a disclosure, but did not get it.  Commonality measures whether a class-wide proceeding can generate an answer to a factual or legal question at the heart of each class member's claim so that such an answer drives the resolution of all claims.  See Wal-Mart Stores, Inc. v. Dukes, *supra,* 131 S. Ct. at 2551 (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.Rev. 97, 131–132 (2009)).  Such commonality requires a showing that the particular injury suffered by each member of the putative class was caused by a policy or practice common to all of them.

Given that plaintiff has withdrawn his own individual claim of negligent failure to disclose, he must prove that, with respect to each class member, Equifax "willfully" failed to disclose the

requested disclosure.  The willfulness analysis, even understood only as a reckless disregard of the obligation to disclose, fails to address the several different ways that consumers requested disclosure and the manifold problems they experienced.  Some consumers went online and requested their disclosures through a website, while others wrote letters to Equifax and Central Source, and yet others made a telephone request.  Some of those who used the internet experienced computer problems ranging from being "timed out" to printer conflicts to lost connection with the server. Telephone and letter requesters misdirected their calls and correspondence,[16] or failed to provide sufficient identification information.  The only common issue among these class members is the fact that they did not receive the requested disclosure on some occasions.[17]  They made requests in different ways and experienced different difficulties, which may or may not have been the product of any recklessness on the part of Equifax.  It is not clear that there is a common factual issue concerning the alleged willfulness or recklessness of Equifax in failing to make these disclosures. Although plaintiff says that Equifax's across-the-board unwillingness to make disclosures is manifested in its "exact match" address policy and the use of low-paid foreign labor to process requests for disclosures, not all consumers who did not receive a disclosure had address discrepancies, or at least, plaintiff has not shown that to be the case.  According to Exhibit C in plaintiff's evidence (i.e., the monthly reports of complaints made to Central Source), there were

---

[16]  There is evidence in the record that some consumers seeking an "adverse action" disclosure telephoned the Central Source 1-800 number, which could handle only "free annual disclosure" requests.  Others, seeking a "free annual disclosure, wrote or called Equifax directly, and they were re-directed to the Central Source website.

[17]  Although not revealed in the evidence, it is possible, even probable, that some consumers included in the putative classes failed to obtain a disclosure on their first attempt, but succeeded on later attempts.  It is problematic whether these consumers suffered the same injury as those who never received a disclosure.

several different problems consumers experienced.  There is no apparent common pattern explaining the problems of all class members.

Plaintiff also has a problem meeting the typicality requirement.  The court of appeals has explained this standard as follows:

> "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3).  [T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large."  Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1322 (11th Cir. 2008) (quotations and internal citations omitted; alteration in original).  Although typicality and commonality may be related, we have distinguished the two concepts by noting that, "[t]raditionally, commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the named plaintiff in relation to the class."  Piazza v. Ebsco Industries, Inc., 273 F.3d 1341, 1346 (11th Cir. 2001) (citing Prado-Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1279 (11th Cir. 2000)).

Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1275 (11th Cir. 2009).  Here, plaintiff's claims of denial of both a "free annual disclosure" and an "adverse action" disclosure are not typical of all members of the classes.  For example, plaintiff apparently never attempted to use the Central Source online website to obtain his "free annual disclosure," even though the vast majority of such requests are made that way.  Plaintiff cannot claim that Equifax willfully or recklessly used a computer system to deny his requests of disclosure because all of his requests were made by telephone or in writing.  While it may be true that plaintiff shares the fact with other class members that he did not receive his disclosures, he does not share with them the same reasons for not getting a disclosure.  The reason plaintiff did not receive his disclosure is because of a discrepancy in his address.  It appears that other consumers did not receive their disclosures for a host of other reasons, including computer

malfunctions, time outs and disconnections, and failure to provide adequate identification.[18]  It is difficult to say that there was a "typical" reason why any particular consumer, including the plaintiff, was denied a requested disclosure.

Plaintiff's claim also is not typical of those members of the putative classes who suffered actual damages due to non-disclosure of their credit reports.  Undoubtedly there are some members of the putative classes who suffered loss due to identity theft or erroneous credit-file entries that could have been detected if the requested disclosure was made by Equifax.  Likewise, members of the "adverse action" class might have suffered actual damages in the form of higher credit costs or lost credit opportunities due to errors in their reports that might have been corrected once disclosure was made.  Plaintiff does not claim any such actual damage, so that his claim is not typical of these.

There are grave questions also about the adequacy of the plaintiff as a class representative. Without attempting to pile on the plaintiff, the record evidence shows that he suffers from ADHD and that most of his business dealings and decisions are made by his father.  His father (who does not purport to be a plaintiff or class member) made most of the contacts with Equifax without plaintiff's knowledge.  When plaintiff met with his attorneys about this case, his father attended as well.  The decision to sue was at least a joint decision between plaintiff and his father.  In short, the court has grave concerns about the plaintiff's independent ability to represent the class and make decisions in his fiduciary capacity as the class representative.

-------

[18]  See Exhibit C to Plaintiff's Evidentiary Submissions in Support of Class Certification. These monthly reports from Central Source purport to show complaints made by consumers concerning efforts to obtain disclosure of their credit files from Equifax.  The categories under which the complaints were sorted show a variety of problems experienced by complaining consumers.

Citing <u>Kirkpatrick v. J.C. Bradford & Co.</u>, 827 F.2d 718, 728 (11th Cir.1987), the Eleventh

Circuit noted in <u>London v. Wal-Mart Stores, Inc.</u>, 340 F.3d 1246 (11th Cir. 2003), that it is only in

securities cases that "adequacy" focuses only on the competence of class counsel.  In other types of

cases, the adequacy of the class representative himself must be examined.  The court said:

> Nonetheless, in <u>Kirkpatrick v. J.C. Bradford & Co.</u>, 827 F.2d 718, 728 (11th Cir.1987), this court held that in *securities cases*, as long as class counsel is "competent and zealous," the named plaintiffs are not inadequate merely because "of a perceived lack of subjective interest," but only if "their participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case." However, this court carefully limited its holding to the securities context, noting that neither the Eleventh Circuit nor the Supreme Court has established specific standards for Rule 23(a) adequacy.  Thus, the court concluded, "Because the issue of adequate class representation arises in a wide variety of contexts, it would be inappropriate for us to establish a standard for general application."  <u>Kirkpatrick</u>, 827 F.2d at 727-28. In the same case, we stated with approval the general principle that adequacy of representation is primarily based on "the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the ... class" and "whether plaintiffs have interests antagonistic to those of the rest of the class." <u>Id.</u> at 726 (internal quotations omitted).  In fact, we went on to note that meeting these requirements might still be insufficient if the "named plaintiffs ... do not possess the personal characteristics and integrity necessary to fulfill the fiduciary role of class representative." <u>Id.</u>

> This court has noted that "basic consideration of fairness requires that a court undertake a stringent and continuing examination of the adequacy of representation by the named class representative[ ] at all stages of the litigation where absent members will be bound by the court's judgment."  <u>Shroder v. Suburban Coastal Corp.</u>, 729 F.2d 1371, 1374 (11th Cir. 1984) (holding that, where named plaintiff was employee of class counsel, district court did not abuse its discretion by denying class certification).

* * *

The requirement for a stringent examination of the adequacy of the class representative is especially great when, as in this case, the attorney's fees will "far exceed[ ]" the class representative's recovery.  <u>See Shroder</u>, 729 F.2d at 1375.  In such circumstances, "courts fear that a class representative who is closely associated

39

with the class attorney [will] allow settlement on terms less favorable to the interests of absent class members."  Id.

Thus, in this case, the district court was required to "undertake a stringent ... examination of the adequacy of representation by the named class representative[ ]."

London v. Wal-Mart Stores, Inc., 340 F.3d 1246, 1254 (11th Cir. 2003).

The same is true in the instant case.  The court is required to undertake a rigorous analysis of the adequacy of the plaintiff as a class representative, to determine whether he is capable of making independent decisions in the interest of the classes he purports to represent.  Class representatives are not mere ciphers, wholly dependent upon and subservient to class counsel.  Class representatives serve the important fiduciary role of exercising the independent judgment and decision-making authority of the "client" in the attorney-client relationship, and this is doubly important in class action litigation because the claims and interests of absent class members are being impacted.

Given the evidence in the instant case that Corey Singletery relies on his father to make most decisions for him, it is clear to the court that plaintiff is not adequate as a class representative.  The records strongly suggests that he lacks the capacity and willingness to make his own independent judgments about the course of this litigation, apart from the influence of his father and with the advice (not control) of counsel.  The role of the class representative is too important, as a bulwark protecting the interest of absent class members, to fail to assure that the class representative can make mature, informed decisions for himself.[19]

---

[19]  Additionally, the court is concerned with plaintiff's apparent decision to forgo claims for negligent failure to comply with the disclosure requirement of FCRA.  See 15 U.S.C. § 1681o. While it appears to be true that plaintiff cannot prove that he suffered any "actual damages" from

Beyond the four prongs of Rule 23(a), a class may be certified only if one of the alternative additional requirements of Rule 23(b) also is met.  Here, it appears that plaintiff is seeking a Rule 23(b)(3) class for damages.  This requires the plaintiff to prove that common issues of fact or law predominate over individual issues and that class action is "superior to other available methods for the fair and efficient adjudication of the controversy."  The court finds that plaintiff has failed on both prongs.

First, for many of the same reasons discussed above concerning commonality, plaintiff cannot show that common issues predominate over individual issues.  In looking at the predominance question, the court of appeals has explained:

> "Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action."  Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir. 2000).  Common issues of fact and law predominate if they "'ha[ve] a direct impact on every class member's effort to establish liability *that is more substantial than the impact of individualized issues* in resolving the claim or claims of each class member.*"  Vega, 564 F.3d at 1270 (emphasis added) (quoting Klay, 382 F.3d at 1255).  If "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, [their] claims are not suitable for class certification under Rule 23(b)(3)."  Klay, 382 F.3d at 1255.  In practical terms, while "[i]t is not necessary that all questions of fact or law be common," id. at 1254 (citation omitted), "the addition or subtraction of any of the

---

the non-disclosure of his consumer credit reports, that may not be true (and probably will not be true) for some portion of the putative plaintiff classes.  Not only does this mean that plaintiff's claims are not typical of that segment of the putative classes, but he also has not adequately taken into account the effect of his decision to forgo negligence claims on the claims of other class members.  Some class members may well have actual damages claims that will be lost under the structure of this action pursued by plaintiff.  Cf. Wal-mart Stores, Inc. v. Dukes, ___ U.S. ___, 131 S. Ct. 2541, 2559, 180 L. Ed. 2d 374 (2011) (noting that named plaintiffs' decision to forgo claims for compensatory damages in order to create greater "predominance" of common issues on back pay for Rule 23(b)*(2)* class, created the risk that "individual class members' compensatory-damages claims would be *precluded* by litigation they had no power to hold themselves apart from." (Italics in original)).

plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered."  Id. at 1255 (quoting Alabama v. Blue Bird Body Co., 573 F.2d 309, 322 (5th Cir. 1978)).

To assess the impact of a common question on the class members' claims, a district court obviously must examine not only the defendant's course of conduct towards the class members, but also the class members' legal rights and duties.  A plaintiff may claim that every putative class member was harmed by the defendant's conduct, but if fewer than all of the class members enjoyed the legal right that the defendant allegedly infringed, or if the defendant has non-frivolous defenses to liability that are unique to individual class members, any common questions may well be submerged by individual ones.

Sacred Heart Health Systems, Inc. v. Humana Military Healthcare, 601 F.3d 1159, 1170 (11th Cir.

2010).  In this case, there are multiple factual questions that must be addressed with respect to the

claim of each individual class member, and these individual issues more than overwhelm the

common ones.  Plaintiff alleges that the defendant "willfully" failed to disclose his requested credit

reports, but the undisputed evidence portrays a comedy of human errors, not recklessness or

willfulness, leading to the denial of plaintiff's consumer credit file.  In particular, the error in

plaintiff's case arose from a discrepancy in his address.  Whether the denial of credit reports to other

consumers was willful or reckless or negligent or, even, proper requires an inquiry into the facts of

each such denial.  A consumer is entitled to either a free annual disclosure or an "adverse action"

disclosure only after making a proper request.  This requires an inquiry in each case into whether the

consumer used the appropriate avenue,[20] offered "proper" identification,[21] and made only one request

---

[20]  For example, free annual disclosures can be requested only through Central Source.  See 15 U.S.C. § 1681j(a)(1)(B).  And Central Source cannot handle requests for "adverse action" disclosures.

[21]  See 15 U.S.C. § 1681h.

in each twelve-month period.[22]   It requires an inquiry into whether Equifax correctly sought

additional identification information from the requester, and whether the requester responded.   It

must be remembered that plaintiff's claims on behalf of the class allege that Equifax recklessly[23]

failed to make disclosures, but recklessness, as the Supreme Court stated in Safeco, is a very fact-

specific question.   The recklessness of the credit-reporting agency cannot be establish simply on the

basis that there is a record of a request being made and a record that it went unfulfilled.   Each

instance of a consumer being denied disclosure would prompt the fundamental question whether,

in this particular instance, Equifax acted recklessly, negligently, or properly?  Was the disclosure not

made because of simple human error or oversight?  Was it due to unexplained discrepancies in the

requester's address, name, or date of birth?  Was it due to transposed digits in his Social Security

number?  Did the consumer attempt to request more than one disclosure during a twelve-month

period?  How many unfulfilled requests has the consumer made? Did the consumer suffer "actual

damages" from the non-disclosure?  Was the request made by the consumer, or someone fraudulently

posing as the consumer?  These individual questions simply overwhelm any common questions of

law or fact.  For that reason, plaintiff cannot show that common issues predominate over individual

issues.  The opposite is the case.

---

[22]   A consumer is entitled to only one free annual disclosure from a credit reporting agency
in any twelve-month period.  See 15 U.S.C. § 1681j(a)(1)(A).

[23]   As discussed with respect to plaintiff's individual claims, the court rejects the argument
that Equifax's reliance on an "exact match" address protocol and low-paid foreign labor to process
requests, by themselves, show recklessness.  Plaintiff has not identified a particular policy or
procedure adopted by Equifax, which was common to the denial of disclosures to all class members,
that can be characterized as reckless in the sense that it involved a risk of unlawful non-disclosure
substantially higher than the risk posed by simple carelessness.

Also, a class action is not necessarily a superior method for a fair and efficient adjudication of the controversy.  There is no reason that each consumer who feels he has been illegally deprived of disclosure of his credit report cannot assert that claim for himself.  The court cannot assume that all claims under §§ 1681n and 1681o are small.  Some consumers may well have suffered significant "actual damages," far greater than the statutory damages provided, so that there is an economic incentive to pursue the claim.  But even those consumers who are limited to the statutory damages of $1,000 are also potentially entitled to punitive damages and attorney's fees, meaning that there is little or no economic barrier to pursuing individual claims.  Individual claims would be far more factually focused and better able to assess the fact-specific nature of the alleged recklessness of the credit-reporting agency.

Moreover, if the court were to define the classes to include only those consumers who suffered no actual damages, the superiority assessment tilts even more toward denying class treatment.  In such a circumstance, the classes would be composed of potentially millions of consumers who suffered no actual damages due to the non-disclosure of their credit files.  Yet, due to statutory damages provided in § 1681n, Equifax could face an award against it in the hundreds of millions of dollars, plus punitive damages and attorneys' fees.  Courts have observed that a class action is not superior to other methods of resolution where the class action involves the prospect of "annihilative damages" against the defendant out of all proportion to the harm suffered by the plaintiffs.  For example, one court has written:

> There is "nothing in the [FACTA] statute ... that mandates class action treatment of FACTA claims or precludes a district court from considering the prospect of annihilative liability in the certification calculus." Stillmock v. Weis Markets, Inc., No. 09-1632, 2010 WL 2621041, at * 8 (4th Cir. July 1, 2010) (Wilkinson, J.

concurring); see also Klay v. Humana, Inc., 382 F.3d 1241, 1271 (11th Cir. 2004) ("In cases where 'the defendants' potential liability would be enormous and completely out of proportion to any harm suffered by the plaintiff,' we are likely to find that individual suits, rather than a single class action, are the superior method of adjudication") (quoting London v. Wal-Mart Stores, Inc., 340 F.3d 1246, 1255 n. 5 (11th Cir.2003)). "Certifying a class action that would impose annihilative damages where there has been no actual harm from identity theft could raise serious constitutional concerns."  Stillmock, 2010 WL 2621041, at * 10 (Wilkinson, J. concurring).

Ehren v. Moon, Inc., 2010 WL 5014712, *2 (S.D. Fla., Dec. 3, 2010).  Such is the case here.  Each of the millions of consumers who requested but did not receive a disclosure would be entitled to between $100 and $1,000 in statutory damages, plus punitive damages (for willful or reckless non-disclosure) and attorney's fees, even though none of them suffered any actual harm.  For this reason also, the court finds that a class action is not a superior method for resolving the controversy.  Individual lawsuits, controlled by each complaining consumer, focused on the specific facts of the denial of his request, and providing an appropriate measure of actual, statutory, or punitive damages[24] and attorney's fee, is superior to class treatment.

For all of the foregoing reasons, the court finds that the plaintiff has failed to establish that class certification is proper in this case.  Thus, the motion for class certification should be denied.

---

[24]   The court also believes that the potential for punitive damages augurs for individual lawsuits, not class treatment.  One of the purposes of punitive damages is to punish the defendant, and this requires an assessment of the defendant's culpability relative to each consumer's request for disclosure.  In some instances, Equifax may be grossly culpable for not disclosing the consumer file, but in others, like this one, guilty of nothing more than simple neglect.  The assessment of whether punitive damages are warranted, and for how much, is better made on a case-by-case basis, rather than collectively for a class of millions.

Conclusion and Recommendation

Based on the undisputed facts presented by the parties, and the evidentiary materials and briefs filed in support of and in opposition to their motions, the magistrate judge RECOMMENDS that the plaintiff's motion for certification of two classes in this case be DENIED, and that the defendant's motion for summary judgment with respect to the named plaintiff's individual claims be GRANTED and this action DISMISSED WITH PREJUDICE.

Any party may file specific written objections to this report and recommendation within fifteen (15) days from the date it is filed in the office of the Clerk.  Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fifteen (15) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal.  Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.  A copy of the objections must be served upon all other parties to the action.

DONE this 21st day of September, 2011.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE