## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

COREY SINGLETERY, individually and on behalf of a class of similarly situated persons,    )
)
)
)

    Plaintiff,    )
)

vs.    )

               **CASE NO. 2:09-CV-0489-SLB**

EQUIFAX INFORMATION SERVICES, L.L.C.,    )
)
)
)

    Defendant.    )

### MEMORANDUM OPINION

On September 22, 2012, the Magistrate Judge filed his Report and Recommendation, (doc. 149),[1] recommending plaintiff's Motion for Class Certification, (doc. 94), be denied, and defendant's Motion for Summary Judgment, (doc. 119), be granted. Plaintiff filed an Objection to the Magistrate Judge's Report and Recommendation, (doc. 150), to which defendant responded, (doc. 152). Based upon the court's consideration of all the materials in its file, including the Report and Recommendation, the court is of the opinion that plaintiff's Objection is due to be overruled and the Magistrate Judge's Recommendation is due to be accepted. Plaintiff's Motion for Class Certification, (doc. 94), will be denied and defendant's Motion for Summary Judgment, (doc. 119), will be granted.

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

# I.  STANDARD OF REVIEW OF THE REPORT AND RECOMMENDATION

The district court reviews de novo those parts of the Report and Recommendation to which a party objects.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3)("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.").  The court may review the other parts of the Report and Recommendation for plain error or manifest injustice.  *United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983)(citing *Nettles v. Wainwright*, 677 F.2d 404, 410 (11th Cir. 1982)).  "The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

# II.  STATEMENT OF FACTS

The Magistrate Judge made the following findings of fact, which the court **ADOPTS**:

Equifax is a consumer reporting agency, which gathers information about consumers from various sources and uses it to create credit files on more than 200 million consumers in the United States.  Equifax assembles that information into consumer reports and sells those reports to subscribers who have a permissible purpose under the FCRA for obtaining consumer credit information.  Under certain circumstances, Equifax also provides consumers with free credit-file disclosures, which are commonly referred to as "credit reports."  Plaintiff is a 25 year-old high school graduate who has lived with his parents for most of his life.  Plaintiff suffers from attention deficit hyperactivity disorder ("ADHD") and has difficulty comprehending sentences and conversations, reading, and writing.

Beginning in 2004, as mandated by the FACT Act, Equifax joined with the other two national credit-reporting agencies, Experian and Trans Union, to set up a central contact point through which consumers may request a free annual credit disclosure from each or all of the credit-reporting agencies.  A

2

corporation known as Central Source LLC was created jointly (and is jointly owned) by the three national credit-reporting agencies to receive consumer requests for free annual disclosures, and these requests are received via a website, a telephonic Voice Response Unit (VRU), and through the mail. When Central Source receives a consumer request, it forwards the request to the appropriate credit-reporting agency.  To fill these requests, Equifax has outsourced the work to two entities, Direct Data Capture ("DDC") and Intellinet.  DDC is located in Atlanta, with an affiliate in the Philippines. Pursuant to an outsourcing agreement, all web-based, telephonic, and written requests for a free annual disclosure from Equifax were processed by DDC-Philippines employees.  The contract between Equifax and DDC-Philippines set certain performance standards generally requiring DDC-Philippines to process requests for free annual disclosures within 24 to 48 hours with a 90% accuracy rate.  All employees of DDC-Philippines were trained in Equifax policies relating to filling requests for free annual disclosures, and each employee was rated or graded on his or her performance under those standards.  The work of DDC-Philippines employees also was audited by a quality assurance auditor required to examine at least 1% of the transactions processed by each employee every two weeks.  A failure by DDC-Philippines to achieve the 90% accuracy rate, or otherwise comply with Equifax requirements, could result in Equifax reducing the contract fees it owed to DDC-Philippines for its services, or even cancellation of the contract with DDC-Philippines.  In months when accuracy rates reach 100%, DDC was entitled to a bonus from Equifax.

Although Central Source was established to receive consumer requests for free annual disclosures, any requests following an "adverse action" were also forwarded to the respective credit-reporting agencies. Central Source also forwarded to the appropriate credit-reporting agency any consumer "complaints" received, which could include complaints by consumers who had not received disclosures requested by them.

Equifax had no information regarding plaintiff in its consumer database prior to April 2005.  Plaintiff's Equifax credit file was created on or about April 7, 2005, to store an inquiry made by Wachovia Bank.  Wachovia identified the consumer as Corey Singletery and provided an address of "116 English KN, Birmingham, Alabama 35235."  The initial information in the file, including the name and address, came entirely from Wachovia Bank, but additional information was added at various times later. In 2007 and 2008, five inquiries from creditors (requests for credit reports) were made on plaintiff's

credit file.  To make an inquiry regarding a consumer, the creditor must enter identifying information into Equifax's system, such as the consumer's name, address, and/or Social Security number.  Two creditors who made inquiries in June 2007 listed plaintiff's address as "1167 English Kn," Birmingham, Alabama, and the remaining 2007 and 2008 inquiries listed plaintiff's address as "1667 English KN," Birmingham, Alabama.  Equifax generally obtains consumer addresses from furnishers of information, which report credit information about consumers to Equifax.  A furnisher of information may be a bank, credit card company, loan company, debt collector, or other types of creditors/lenders that extend credit to consumers.  After the creation of plaintiff's credit file in April 2005, furnishers and other creditors that made inquiries about plaintiff's credit file reported the address information each creditor had on file regarding plaintiff to Equifax.  A consumer's credit file is not updated based on information contained in an inquiry by a creditor.  Thus, if an address given for a consumer in a creditor inquiry is different from that in the consumer's credit file, the file will not be updated with the address listed in the consumer's inquiry.  In this case, the address of "116 English KN" for plaintiff was not updated or changed between the time of his file's creation in 2005 and early 2009.

In May 2008, plaintiff applied for credit at a retail electronics store, HH Gregg.  The store's credit accounts were serviced by GE Money Bank (also referred to as GE Consumer Finance), which made an inquiry about the plaintiff's consumer credit file on May 9, 2008.  That same day, May 9, 2008, the creditor informed plaintiff that credit would be denied.  The creditor later notified plaintiff in writing that the credit denial was based in part on information supplied by Equifax, and it further advised him how he could obtain a copy of his credit file from Equifax, giving plaintiff a 1-800 number to contact Equifax.  The 1-800 number was a dedicated line for receiving requests for disclosures following "adverse actions," and that number was supplied to creditors for use when the creditor denied credit or otherwise took "adverse action" with regard to a consumer's credit.  The "adverse action" toll-free number is different from the Central Source number because Central Source was set up under the FACT Act to comply with the congressional mandate that the credit-reporting agencies provide a central contact point for consumers seeking a free annual disclosure.  Central Source was not set up to take and process "adverse action" requests for disclosure, and there is a separate toll-free number given to consumers in "adverse action" letters for making those requests.

4

GE Money Bank gave plaintiff notice of the denial of credit and his right to seek a copy of his credit file from Equifax in a letter dated May 9, 2008.  Although plaintiff does not personally remember the letter, he believes his father received it, opened it, and later explained it to him.  (Depo of Corey Singletery, Doc. 98-15, pp. 39-41).  Because plaintiff's Attention Deficit Hyperactivity Disorder ("ADHD") makes it difficult for him to process information quickly, he authorized his father to conduct certain business for him, including contacting Equifax and other credit reporting agencies after receiving the letter from GE Money Bank.  (Id. at pp. 38-42).  Plaintiff authorized his father to make inquiries for him concerning a free annual credit disclosure from Equifax.  (Id. at pp. 49-51).  Plaintiff himself never personally contacted Equifax, and he has no knowledge of how, when, or by what means his father may have requested a free annual credit disclosure on his behalf.  (Id. at pp. 53-54).  After discussing it with his father, it was plaintiff's father who made the actual decision to request the free annual disclosure.  (Id.).  There is testimony in the record that plaintiff did attempt to call a 1-800 number for Equifax, but hung up in frustration.  Plaintiff's father testified that he first called the 1-800 number listed in the GE Money Bank declination [letter] (see James Singletery Depo., Doc. 127, pp. 172-173), during which he a got a recording asking for identification information for the person making the request.  Plaintiff's father supplied the information (either by speaking it into the telephone or by pressing buttons on the telephone number pad).  Thereafter, he and plaintiff expected to receive a credit report.  When no credit report arrive, plaintiff's father contacted a local office of the Federal Trade Commissions and was given a telephone number to contact Equifax.  Apparently this number was the 1-800 number for Central Source.

The 1-800 number called by plaintiff's father on or about May 24, 2008, was the Central Source number through which consumers call to request a free annual credit disclosure from any or all three of the nation credit reporting agencies, Equifax, Experian, and Trans Union.  The number was not the dedicated line for receiving "adverse action" requests for disclosure that was listed in the GE Money Bank letter.  After making the call, plaintiff received credit reports from Trans Union and Experian, although these came more than 15 days following the request, but he did not receive a disclosure from Equifax.  Other than the initial call to the dedicated "adverse action" number, there is no evidence that either plaintiff or his father ever told Equifax that GE Money Bank had denied plaintiff credit, or that plaintiff was seeking a disclosure due to the "adverse action" of the credit denial.  Their dealings with

Equifax after May 24, 2008, were either in written letters or through the Central Source number.

Soon after the May 24 telephone call, plaintiff or his father received a letter from Equifax dated May 25, 2008, that acknowledged his request for a free annual credit disclosure, (see Declaration of Alicia Fluellen, Ex. B-3, Doc. 123, p. 23); however, the letter requested that plaintiff supply additional identification information.   This letter was mailed by DDC-Philippines employee Melissa Oray.  The letter was mailed because the address for the plaintiff given during his request for a disclosure did not match the address on the credit file, thus requiring further identification to assure that the person requesting the disclosure was the consumer himself.   The additional identification required by the letter included at least one form of documentation of the plaintiff's Social Security number and another form of documentation containing plaintiff's then-current mailing address of 1667 English Knoll Ln.

On June 5, 2008, plaintiff or his father mailed to Equifax a copy of his Social Security card and a copy of his Alabama non-driver identification card, showing his address as 1667 English Knoll.  (Id., pp. 25-26).  This letter was received by Equifax (and forwarded electronically to DDC-Philippines) on June 9 or 10, 2008.  Even before the plaintiff's letter was received, however, Equifax received another telephonic request through Central Source for a free annual disclosure of plaintiff's credit file.  Because of the discrepancy between the plaintiff's address given in the request and his address on the credit file, another DDC-Philippines employee, Gladys Abella, sent a second letter to plaintiff, dated June 6, 2008, requesting the same identification information requested in the May 25 letter.

The computer system used for responding to requests for disclosure queues the requests for display to the next available DDC-Philippines agent.  This means that different agents may deal with a particular consumer's disclosure request at different times; the request or follow-ups do not stay with the first agent that deals with it.  During 2008, there were approximately 270 Equifax agents and employees responding to requests for disclosure.

When Equifax ultimately received plaintiff's June 5 letter on June 9 or 10, the information in it was sufficient to authorize an Equifax agent to update plaintiff's credit file to correctly reflect his current mailing address as "1667 English KN," rather than the "116 English KN" the file contained.  Equifax

agrees that plaintiff should have received his free annual disclosure in response to his June 5 letter.  For some reason, however, the file update did not occur, and on June 11, a DDC-Philippines employee, John Cadiz, mailed yet a third letter to plaintiff directing him to contact Central Source to obtain his free annual disclosure.

Plaintiff's father did so on June 19, 2008, again contacting Central Source telephonically to request plaintiff's free annual disclosure.  This request was again routed to DDC-Philippines for processing, and on June 25, DDC-Philippines employee Mary Boliano mailed plaintiff another letter requesting the same identification information previously requested in the May 25 and June 6 letters.  Plaintiff's credit file still was not updated to reflect his current address as "1667 English KN," not "116 English KN."

On July 1, 2008, plaintiff's father handwrote a letter to Equifax, on plaintiff's behalf, again supplying a copy of plaintiff's Social Security card and his Alabama non-driver identification card showing his current address of "1667 English KN."  The letter also included a copy of the June 25 letter from Equifax (DDC-Philippines).  Plaintiff's [father's] handwritten letter stated:

To Whom It May Concern:

I have sent in your request twice, and this is my last time trying to get a copy of my credit report.  If I don't receive a copy very soon, I will do what's necessary legally to obtain my credit report.

/S/ Corey Singletery

(See Fluellen Decl., Ex. B-7, Doc. 123).  Equifax received the letter on July 5 and routed it to DDC-Philippines, which again failed to update plaintiff's credit file with the information contained in the letter.  Equifax agrees that the information was sufficient to authorize an agent to update plaintiff's file and make a disclosure to him.  Instead, DDC-Philippines employee Romel Cofuentes mailed a letter to plaintiff on July 8, 2008, directing him, as did the June 11 letter, to the Central Source website to obtain his free annual consumer disclosure.

Plaintiff complied yet again, when his father telephoned Central Source on his behalf on July 14 to request a free annual disclosure.  Once again, because plaintiff's address in the credit file had not been updated,

7

DDC-Philippines employee Janet Alleto mailed a letter to plaintiff on July 17, 2008, requesting the same identification information previously requested and supplied by plaintiff twice before.  Plaintiff finally received his free annual credit report almost a year later, after this action was filed, on May 27, 2009.

Between 2007 and January 31, 2011, Equifax fulfilled 43 million requests for consumer credit disclosures, with about 12 million being fulfilled during 2008 alone.  Of the requests actually fulfilled by Equifax, 95% were fulfilled automatically without processing by an employee.  For the time period from March 2007 through March 2009, Central Source received 41,784,337 requests for disclosure of files from Equifax, and during that same 25-month period, Equifax fulfilled 24,418,047 requests, or about 58.44% of the requests received.  In order to forward a request for a free annual credit disclosure to a credit-reporting agency, Central Source requires the following data points to identify the requesting consumer:  1) Social Security number, 2) date of birth, 3) first name, 4) middle name, 5) surname, 6) suffix (e.g., "Jr."), 7) current mailing address, and 8) previous mailing address if the current address is less than two-years old.  Without this information, Central Source will not forward a request for a free annual disclosure to the respective credit-reporting agencies.  Central Source was created in response to the mandate of the FACT Act that the credit-reporting agencies band together to create a "central" portal through which consumers could request free annual disclosures.  Central Source does not process consumer disclosures on requests arising from an "adverse action," it takes only requests for free annual disclosures.  Central Source is jointly owned and operated by all three nationwide credit-reporting agencies:  Equifax, Trans Union, and Experian.

Plaintiff's expert, Evan Hendricks, expresses the opinion that Equifax has created a system that intentionally or recklessly makes it difficult for consumers to obtain free consumer disclosures, and that this was done to maximize revenue and profit.  In particular, Hendricks asserts that Equifax's use of an "exact match" protocol for identifying consumers requesting a disclosure defaults in favor of denying disclosure, even though Equifax uses a "partial matching algorithm" when searching for a consumer credit file in response to an inquiry from a subscriber creditor.  Additionally he contends that Equifax's use of outsourced, low-pay labor to process disclosure requests results in "hyper-compartmentalization" of the process that does not require or even allow agents to investigate and problem-solve minor discrepancies or problems in a consumer's request for disclosure.  The process is like an assembly line, where low-paid employees in the Philippines quickly review

disclosure-request information on a computer screen and are given a limited number of choices for processing the request.  Essentially, agents processing a request can make the disclosure if the identify of the requesting consumer is confirmed, or send a form letter requesting additional identification, or decline the request (as, for instance, when it is a second request within twelve months).  Agents can update identification information associated with a consumer file if sufficient documentation is presented, such as that requested in the May 25 and June 6 letters mailed to plaintiff.  Hendricks expresses the opinion, however, that Equifax agents are not properly trained and that there are no quality assurance checks made of their work.

At least 852 consumers have complained to the Federal Trade Commission about various problems they have experienced in obtaining their credit-file disclosures from Equifax.  Other than two of these complaints, it appears that the complaints to the FTC are not forwarded to Equifax.  Equifax denies that it has any knowledge of complaints filed with the FTC.  Additionally, Central Source reports to Equifax and other credit-reporting agencies complaints received from consumers regarding requests for free annual disclosures.  Exhibit C in plaintiff's evidentiary submissions in support of his motion for class certification is a compilation of complaint and error reports from Central Source to Equifax.  The reports break down complaints both by whether Equifax was specifically identified as the agency involved and by the nature of the complaint in the context of web-based requests, VRU-based requests, and mail requests for disclosure.  Looking at the months of March 2008 through September 2008 (the months surrounding the plaintiff's efforts to get his credit report disclosure), the following numbers of complaints specifying Equifax, compared to all complaints, appear:

|  | VRU Equifax/All | Mail Equifax/All | Total for Equifax/All |
|---|---|---|---|
| 3/2008 | 93 of 319 (29.1%) | 188 of 488 (38.5%) | 3100 of 9342 (33.2%) |
| 4/2008 | 108 of 369 (29.3%) | 222 of 582 (38.1%) | 3360 of 9233 (36.4%) |
| 5/2008 | 98 of 312 (31.4%) | 202 of 523 (38.6%) | 3045 of 8179 (37.2%) |
| 6/2008 | 133 of 419 (31.7%) | 241 of 561 (42.9%) | 3285 of 8636 (38.0%) |
| 7/2008 | 93 of 359 (25.9%) | 289 of 589 (49.1%) | 3643 of 9222 (39.5%) |
| 8/2008 | 73 of 299 (24.4%) | 259 of 569 (45.5%) | 3191 of 8344 (38.2%) |
| 9/2008 | 94 of 310 (30.3%) | 269 of 592 (45.4%) | 3000 of 8026 (37.4%) |
| Totals | 692 of 2387 (28.99%) | 1670 of 3904 (42.8%) | 22624 of 60982 (37.1%) |

(Doc. 149 at 7-17 [footnotes omitted].)

9

### III. <u>MOTION FOR SUMMARY JUDGMENT</u>

#### A.  FACTA AND CRA'S DUTY TO DISCLOSE

The Magistrate Judge set forth the law applicable to this case as follows:

> The duty of a credit reporting agency [CRA] to disclose to consumers the contents of their credit files (excluding disclosure of certain types of information) is stated as part of the Fair Credit Reporting Act ("FCRA"), at 15 U.S.C. § 1681g.  "Every consumer reporting agency shall, upon request, and subject to section 1681h(a)(1) of this title, clearly and accurately disclose to the consumer:  (1) All information in the consumer's file at the time of the request . . . ."  The willful failure of a credit-reporting agency to make the disclosure in response to a proper request exposes the agency to potential civil liability under § 1681n(a), which states:

>> Any person who willfully fails to comply with any requirement imposed under  this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of –

>> (1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or

>> \* \* \*

>> (2)  such amount of punitive damages as the court may allow; and

>> (3)  in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

> But to be a proper request for disclosure, certain conditions apply.  First, the request for a "free annual disclosure" must be made through a "centralized source" established by the credit-reporting agencies for the very purpose of receiving such requests.  <u>See</u> 15 U.S.C. § 1681j, which states:

>> (a)  Free annual disclosure
>>> (1) Nationwide consumer reporting agencies

(A)  In general

All consumer reporting agencies described in subsections (p) and (w) of section 1681a of this title shall make all disclosures pursuant to section 1681g of this title once during any 12-month period upon request of the consumer and without charge to the consumer.

(B) Centralized source

Subparagraph (A) shall apply with respect to a consumer reporting agency described in section 1681a(p) of this title only if the request from the consumer is made using the centralized source established for such purpose in accordance with section 211(c) of the Fair and Accurate Credit Transactions Act of 2003.

In addition to a "free annual disclosure," a consumer may request disclosure of his file after he has experienced an "adverse action" related to credit, such as the denial of credit.  Section 1681j(b) provides:

(b) Free disclosure after adverse notice to consumer

Each consumer reporting agency that maintains a file on a consumer shall make all disclosures pursuant to section 1681g of this title without charge to the consumer if, not later than 60 days after receipt by such consumer of a notification pursuant to section 1681m of this title, or of a notification from a debt collection agency affiliated with that consumer reporting agency stating that the consumer's credit rating may be or has been adversely affected, the consumer makes a request under section 1681g of this title.

Under either option, however, the credit-reporting agency must require that the requesting consumer properly identify himself in order to reduce the risk of improper disclosure and the attendant risk of identity theft.  Section 1681h(a) provides that, "A consumer reporting agency shall require, as a condition of making the disclosures required under section 1681g, that the consumer furnish proper identification."

(Doc. 149 at 18-20.)

11

Plaintiff's Amended Complaint alleges four claims against defendant:  negligent and willful violation of § 1681j(a) based on defendant's failure to provide plaintiff with a free annual credit disclosure and negligent and willful violation of § 1681j(b) based on defendant's failure to provide plaintiff with an adverse-action disclosure.

## B.  NEGLIGENCE CLAIMS

In response to defendant's Motion for Summary Judgment, plaintiff conceded his claims based on negligence.  He does not seek to reassert those claims here.  Therefore, the court **ACCEPTS** the Magistrate Judge's Recommendation that defendant's Motion for Summary Judgment be granted and plaintiff's claims based on negligent failure to disclose be dismissed.

## C.  WILLFUL FAILURE TO DISCLOSE – FREE ANNUAL REPORT

The Report and Recommendation notes four grounds upon which plaintiff rests his claims for willful failure to disclose:

> [Plaintiff] argues that this willful refusal to comply with Equifax's duty of disclosure can be inferred from several facts:  (1) Equifax has a history of opposing congressional action to create a consumers' right to credit file disclosure, (2) Equifax requires an "exact match" of the address of the requesting consumer with the address in its files (even though it uses a "partial matching algorithm" for producing consumer reports to creditors), (3) Equifax has outsourced its system for responding to consumer disclosure requests to low-paid workers in the Philippines using a "hyper-compartmentalized" system that does not allow workers to investigate or resolve problems with consumer addresses, and (4) a number of complaints have been filed with the FTC and through Central Source concerning consumers having problems getting disclosure from Equifax.

(Doc. 149 at 20-21.)

12

### 1.  History of Opposition

The Magistrate Judge found:

> [T]he mere fact that Equifax opposed congressional efforts to pass the FACT Act several years ago says nothing about its present intent to comply with federal law.  Contrary to the assertion that this prior opposition allows one to infer continuing opposition to disclosure, the undisputed evidence shows that Equifax has expended time, effort, and money to comply with the FCRA mandate.  It helped set up Central Source, and continues to play its role in its continuing operation.  Equifax has contracted with a number of service providers (DDC-Atlanta, DDC-Philippines, and Intellinet) to help receive and process consumer requests for disclosure, and it has expended time, effort, and money to train and audit these agents.  While plaintiff points to four months in 2008 (March, April, May, and June) when DDC-Philippines' quality assurance standard fell below the 90% mark required by its contract with Equifax, this also means that the vast majority of months DDC-Philippines agents processed requests for disclosure between 2005 and 2010, an accuracy rate of 90% was achieved.  Certainly, this demonstrates a good-faith effort by Equifax to assure the greatest accuracy possible when dealing with tens of millions of consumer requests.

(Doc. 149 at 24-25.)  Plaintiff objects to this finding on the ground that the Magistrate Judge improperly weighed the evidence in favor of defendant and that he "invaded the province of the jury" by inferring from evidence of defendant's contract with DDC and of DDC's performance standards that defendant had acted in good faith."  (Doc. 150 at 17.)[2]  He does not object to the Magistrate Judge's finding that defendant's "prior opposition" to the disclosure law is not relevant to its "present intent."

---

[2]The page number cited in plaintiff's Objection to Magistrate Judge's Report and Recommendation, (doc. 150), refer to the page numbers assigned to the document in the court's electronic filing system.

Plaintiff's objections to the Magistrate Judge's Report and Recommendation regarding plaintiff's argument based on defendant's history of opposition to FACTA are **OVERRULED**.

### 2. Exact Match Policy

In his Response in Opposition to Equifax Information Services, LLC's Motion for Summary Judgment, (Doc. 139), plaintiff contends, "Equifax's exact match policy for consumer disclosures violates FACTA because it requires more than the minimal personal information necessary to properly identify consumers, including Mr. Singletery," and "because Mr. Singletery's street number was not an exact match – Equifax refused to send his [adverse-action] file disclosure and annual file disclosure." (Doc. 139 at 32.)

The evidence is undisputed that, at the time his father requested plaintiff's credit report, plaintiff's credit report showed his house number was "116," and the house number in his request was "1667." He contends the difference in house numbers was a mere "cosmetic error."[3] However, the court finds the difference is substantive and not cosmetic.[4]

---

[3]Plaintiff has cited the court to the statement of John Ford, Chief Privacy Officer of Equifax, to Congress in which he states, "If a credit report has a transposed digit or letter in the address or a missing middle initial, for example, these are ***cosmetic errors***, data that is not critical to the risk decision." (Doc. 150 at 32-33 [quoting John Ford, *Fair Credit Reporting Act: How it Functions for Consumers and the Economy* § 4, ARNOLD & PORTER LEGISLATIVE HISTORY: FAIR ACC. CREDIT ACT LEGIS. 10 (hereinafter "*Ford Statement*")][emphasis added].) However, Ford's statement concerns "the accuracy and integrity of [its] credit database." *Ford Statement* § 4. He describes "cosmetic errors" as errors in the credit files that do not affect the credit decisions of its subscribers. *Id*. Nothing in his statement related to matching credit files with disclosure requests from non-subscribers. As the purposes and safeguards are different between subscribers and

In his Objection, plaintiff cites the court to regulations, since renumbered, limiting the information a central source could collect.  (Doc. 150 at 40 [citing 16 C.F.R. § 610.2(b)(2)(ii) now 12 C.F.R. § 1022.136(b)(2)(ii)].)  The regulations regarding the "centralized source for requesting annual file disclosures from nationwide consumer reporting agencies," 12 C.F.R. § 1022.136(b)(2)(ii), states:

> All nationwide consumer reporting agencies shall jointly design, fund, implement, maintain, and operate a centralized source for the purpose described in Paragraph (a) of this section.  The centralized source required by this part shall:
>
> . . .
>
> (2)  Be designed, funded, implemented, maintained, and operated in a manner that:
>
> . . .
>
> (ii)  Collects only as much personally identifiable information as is reasonably necessary to properly identify the consumer as required under the FCRA, section 610(a)(1), 15 U.S.C. 1681h(a)(1),[5] and other applicable laws and regulations, and to process the transaction(s) requested by the consumer . . . .

_____

consumers requesting credit information, the court finds Ford's statement is not relevant to the determination of what is a cosmetic error in a credit file with regard to free annual disclosure requests by consumers.

[4]Merriam Webster's online dictionary defines "cosmetic" as "not substantive" and "superficial."  *See* <<http://www.merriam-webster.com/dictionary/cosmetic>>.

[5]"A consumer reporting agency shall require, as a condition of making the disclosures required under section 1681g of this title, that the consumer furnish proper identification." 15 U.S.C. § 1681h(a)(1).

*Id*. (footnote added). Plaintiff argues that defendant's exact-match policy violates the regulation limiting the collection of personally identifiable information to only that information that is reasonable necessary because an exact match of a house number is not "reasonably necessary."

An address, including a house number, is personally identifying information that is reasonably necessary to identify the consumer.  *See* 12 C.F.R. § 1022.123 (b)(1).  Under the regulations, CRAs "shall develop and implement reasonable requirements for what information consumers shall provide to constitute proof of identity for purposes" of receiving credit file disclosures, while "[e]nsur[ing] that the information is sufficient to enable the consumer reporting agency to match consumers with their files;" and "[a]djust[ing] the information to be commensurate with an identifiable risk of harm arising from misidentifying the consumer."  12 C.F.R. § 1022.123(a)(1)-(2).  "Examples of information that might constitute reasonable information requirements for proof of identity" include '[t]he identification information of the consumer including his or her full name (first, middle initial, last, suffix), any other or previously used names, ***current and/or recent full address (street number and name, apt. no., city, state, and zip code)***, full nine digits of Social Security number, and/or date of birth." *Id*. (b)(1)(emphasis added).  Requiring a consumer to provide his full address and requiring that the address given matches the address on file fulfills the twin requirements of the regulations.

To the extent plaintiff objects to the Report and Recommendation on the ground that providing an exact match of a consumer's full address requires more than the minimal personal information necessary to properly identify the consumer, that objection is **OVERRULED.**

Plaintiff contends, "A jury should be allowed to determine whether the exact match policy that Equifax has adopted, in light of the other myriad factors outlined herein, constitutes a willful disregard of the consumer's right to a free disclosure." (Doc. 150 at 38.)

On motion for summary judgment, "[t]he inquiry performed [by the court] is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The Supreme Court in *Safeco v. Burr*, held, "[A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco v. Burr*, 551 U.S. 47, 69 (2007). Therefore, before addressing the issue of willfulness or recklessness, the court must find that plaintiff has presented a genuine issue of fact regarding whether defendant's exact-match policy is "a violation under a reasonable reading of [FACTA's] terms." *Id*.

The court finds that requiring an exact match of house numbers in the credit file and in the request is not unreasonable.  It represents a reasonable compromise between sending the report and verifying the consumer's identity.  As set forth above, the court finds no violation of the 16 U.S.C. § 1681j (a) or (b) based on the exact-match policy in this case. The court finds that defendant acted reasonably in requiring additional information before providing plaintiff, or plaintiff's father on his behalf, with a free annual disclosure given that the house number on file for plaintiff was significantly different from the house number submitted by his father in his request for a free annual disclosure.  Therefore, plaintiff has not demonstrated that requesting additional personally identifying information under the facts of this case, was a violation of FACTA.[6]

Plaintiff's objections to the Magistrate Judge's determination that the evidence did not demonstrate a jury question as to defendant's willfulness are **OVERRULED**.

Also, plaintiff objects to the distinction between creditors and consumers noted as relevant by the Magistrate Judge.  As pointed out by the Magistrate Judge, defendant generally has no direct relationship with consumers requesting free annual disclosures. Defendant "only do[es] business with reputable companies whose business practices [it]

---

[6]In his Objection, plaintiff contends, "Although Singletery provided identifying information to Equifax on several occasions, Equifax did not provide him the disclosure until nearly a year after making his first request and only after this lawsuit was filed.  (Doc. 150 at 50.)  Plaintiff did not argue, in opposition to defendant's Motion for Summary Judgment, that his claims were based on a willful or reckless failure to update his information.  (*See* doc. 139 at 31-32, 42-46.)  The court will not consider the issue of defendant's policy or practices for updating information at this stage of the proceedings.

closely scrutinize[s] and validate[s] before qualifying them as legitimate subscribers with a permissible purpose." *Ford Statement* § 2. Unlike creditors/subscribers seeking information on consumers, who have a history and economic relationship, consumers are unknown. When a consumer gives defendant a significantly different address than the one on file, defendant has a right and obligation to seek further information.  Such conduct is not unreasonable.  The court finds that plaintiff has not demonstrated that defendant acted unreasonably in failing to provide him a free disclosure given the significant difference between the address on file and the address given by plaintiff's father during his request.

Plaintiff also objects to the Magistrate Judge's finding "that the risk 'that consumer information will be misused when requested by a creditor is less because the requester is a known subscriber of the credit-reporting agency.'" (Doc. 150 at 31 [quoting doc. 149 at 28].) He argues –

>   While on its face this conclusion seems reasonable it is simply not correct.  As noted, Equifax uses a name recognition software program for fraud detection and to aid in the prevention of identity theft called "Safe Scan." Safe Scan is an Equifax product sold to its business customers, including GE Money Bank.  Equifax used the Safe Scan program when it retrieved the plaintiff's consumer report pursuant to a request made by its subscriber, GE Money Bank, who, during the request, provided Equifax with the same street number as provided by the plaintiff when making his repeated requests for his disclosure.

>   Consumer disclosures, unlike consumer reports, include redacted account numbers and Social Security numbers. Thus, logically, if a consumer disclosure was to fall into the hands of an identity thief, the consumer is at a far lower risk of identity fraud because the thief does not have the consumer's full identifying information.  As we know, a request made through the Central Source must contain the consumer's Social Security number.  Thus, if an

> impostor makes a complete request for a consumer disclosure through Central Source, then the impostor already has more than enough personal information to open a fraudulent account, including the victim's full Social Security number, name, date of birth, address and telephone number.

(Doc. 150 at 31-32.)  Notwithstanding what information is presented to defendant and by whom it is presented, the undisputed fact is that the risk that information provided to a creditor – a subscriber to defendant's information – will be used for an improper purpose is less than the risk that information sent to a consumer will be misused because defendant has scrutinized and validated the creditor/subscriber.  It has not scrutinized or validated the requesting consumers.  In both cases it relies on personal identifying information to retrieve the correct file.  Requiring an exact match of personal identifying information, or additional information if there is not an exact match, ensures that the anonymous requesters are the consumers whose disclosures they request.  The fact that the system distinguishes between consumers and subscribers does not support an inference that defendant established a different system in order to deny consumer's their free annual disclosures or that it did so in reckless disregard for consumers' rights.

Plaintiff's objections to the Magistrate Judge's Report and Recommendation based on the distinctions between information required to disclose credit files to creditors and to consumers are **OVERRULED**.

### 3.  Outsourced System for Responding to Consumer Disclosure Requests

Plaintiff objects to the Magistrate Judge's finding that "the numbers of disclosures requested of Equifax 'requires a system that allows workers to make simple, quick decisions

regarding processing, and inevitably this leads to human error.'" (Doc. 150 at 26 [quoting doc. 149 at 29-30].) The court finds the Magistrate Judge's logic to be unassailable as a matter of common sense and real-world experience. The Report states that defendant processes an average of 23,000 requests for free annual disclosures a day; therefore, defendant "requires a system that allows workers to make simple, quick decisions regarding processing." (Doc. 149 at 29-30.) Human beings making quick decisions, even simple ones, inevitably will make mistakes. (*See id*. at 30.)

However, plaintiff contends that the Magistrate Judge improperly weighed the evidence because defendant did not have to make its decisions in 24-48 hours, as was its policy. Rather, he contends that defendant had ample opportunity to allow its workers time to investigate discrepancies because, under the law, it had 15 days to respond to consumers' requests. (Doc. 150 at 26-27.) He states:

> As an initial matter, the Act requires CRAs to adopt reasonable procedures to handle the volume of requests it receives. The Act does not carve out an exception for an anticipated rate of expected human error. Indeed, Equifax's requirement that DDC-Philippines achieve 90% accuracy when processing the requests should be considered anecdotal evidence of willful failure to follow the Act's requirements.
>
> Under the Act, a CRA has 15 days to fulfill the disclosure request so there is nothing in the Act, which requires workers to make "simple, quick, decisions regarding processing." Rather, it is Equifax's self-imposed policy to "respond" to the disclosure requests within 24-48 hours that leads to these quick decisions and form letters being sent. Consumers would be better served if Equifax used more of the time it is allowed under the Act to "process" the disclosure requests, and determine if a consumer had a cosmetic error in his file, as more requests would actually get fulfilled. Perhaps Equifax should pay heed to the proverb "haste makes waste." Of course, this would take more

21

time and cost Equifax more than the 8 cents it paid to process the disclosures under its current system.

(*Id.* at 26-27.)

Plaintiff's contention that defendant should have allowed its agents more time to investigate discrepancies is irrelevant to plaintiff's claims. The evidence is undisputed that plaintiff's credit file was correctly identified. However, his free annual disclosure was not sent because of a discrepancy between the house number on file and the house number in his request. Inadequate time to investigate was not the cause of defendant's failure to send the report.

As set forth above, the court disagrees that this case involves a mere "cosmetic error" in plaintiff's address. The discrepancy in the house number provided by plaintiff and the one on file was significant. Assuming a worker had stopped the process to compare the house number received – 1667 – with the house number on file – 116 – for plaintiff, the court cannot say with any certainty that such contemplation would have resulted in plaintiff being sent his free annual disclosure without requiring him to provide additional information of his correct address. Without such a showing, plaintiff gains nothing from arguing that DDC-Philippines workers should have taken more time to investigate discrepancies between information received and information on file.

In his Objection, plaintiff argues, "Equifax's automated disclosure policies and procedures systematically disregard additional information supplied by the consumer as requested by Equifax." (Doc. 150 at 34.) As he describes the problem –

22

> [T]he DDC agent can only see the last action taken by the previous agent who attempted to process the consumer disclosure, such as a sent form letter requesting additional information. . . . Here, Plaintiff supplied Equifax with supporting identifying documents and, admittedly, at least two agents did not update the consumers file upon receipt of the requested information, the other DDC agents who received the plaintiff's repeated requests for his consumer disclosure were not able to correct the other agents' errors, and disclose the contents of the consumer's disclosure.  Consequently, Plaintiff found himself ensnared in Equifax's "bureaucratic nightmare, as he responded time and time again to requests for additional information, only to have it go unheeded repeatedly."

(Doc. 150 at 34-35 [citing doc. 149 at 28].)

The evidence in the record shows that defendant's practice is to forward the request and the additional identifying information together.  The agent receiving the request and the additional information is required to update the file with the additional identifying information and send the free annual disclosure.  Preventing agents from looking at documents in files that should have been updated hardly suggests behavior designed to deny consumers their free annual disclosures willfully, nor could such behavior be considered a reckless disregard of the obligation to provide reports.

Under plaintiff's purported scheme, a consumer, with a discrepancy between the information he provided and the information in his report, requests his free annual report.  Because of the discrepancy, he is sent a form letter requesting additional information.  He dutifully responds with the additional identifying information and again requests a free annual disclosure.  The agent receiving the second request and additional identifying information, despite specific instructions to do so, fails to update the file and sends a second

form letter.  The problem is not a policy that prevents a third agent receiving a subsequent request from viewing additional information received by the second agent.  The problem is that the second agent did not update the information.  However, plaintiff did not base his claims on this error or problem with defendant's system.  Rather he limited his claim to the exact-match policy.[7]

Plaintiff's objections to the Magistrate Judge's Report and Recommendation based on defendant's outsourced system for responding to consumer disclosure requests are **OVERRULED**.

### 4. Complaints to FTC and Central Source

Plaintiff objects to the Magistrate Judge's finding that the number of complaints regarding defendant to the FTC and to Central Source are not sufficient to infer defendant acted willfully or with reckless disregard.

The court has reviewed plaintiff's evidence regarding the number of complaints made to the FTC and to Central Source and it finds plaintiff has not shown that these complaints

---

[7]Plaintiff did not argue that defendant willfully or recklessly failed to update his information resulting in his failure to receive his free annual report in opposition to defendant's Motion for Summary Judgment.  Perhaps this omission was the result of information obtained in discovery showing the failure to update the information was not a policy or practice of defendant and/or the failure to update his file was merely negligent.  Regardless of the reason, plaintiff did not argue before the Magistrate Judge that the failure to update his consumer's file with additional identifying information was the cause of his failure to receive his free disclosure and/or that such repeated failures were reckless.

24

are sufficiently significant to allow the court to infer that defendant willfully or recklessly disregarded its obligation to provide free annual disclosures upon request.

As a percentage of the total number of requests received, the number of complaints is too small to support an inference of willfulness. Plaintiff argues that the Magistrate Judge should not have compared the complaints to the total number of requests as the complaints cover only an eleven-month period. Without citation to the record or to caselaw, plaintiff also argues, "The fact that 3,000 consumers each month wrote to . . . Central Source to complain about Equifax is very significant when the Court considers consumer psychology." (Doc. 150 at 21.) Under the circumstances, the court declines plaintiff's invitation to consider the complex and multi-faceted issue of "consumer psychology." Moreover, 3,000 complaints a month out of an average of 976,000 requests, or .31%, is not sufficient to establish defendant had notice that its system was wrongfully denying consumer requests. The court finds no disputed fact concerning the conclusion of the Magistrate Judge that the number of complaints as compared to the number of requests was "minuscule" and "tiny," (doc. 149 at 25), and not statistically significant.

Also, plaintiff has not presented this court with any statistical analysis of the complaints to allow the court to assess the merits of the complaints and their similarity to plaintiff's complaint. If a complaint has no merit and the complainer was not entitled to a free annual disclosure, the complaint says nothing about defendant's intent. Moreover, if the

25

complaint does not concern defendant's exact-match policy, it does not support an inference that defendant's exact-match policy is the result of willfulness or reckless disregard.

The court finds that plaintiff has not shown that the complaints made to the FTC and/or Central Source support an inference that defendant acted willfully or recklessly. Plaintiff's objections to the Magistrate Judge's Report and Recommendation on this ground are **OVERRULED**.

Based on the foregoing, the court **ADOPTS** the Recommendation that defendant's Motion for Summary Judgment be granted. Plaintiff has not shown that defendant's policy of requiring an exact match of the house numbers in his report and in his request before sending his free annual disclosure is an unreasonable violation of FACTA.

## D.  WILLFUL FAILURE TO DISCLOSE FOLLOWING ADVERSE ACTION

Plaintiff contends that the Magistrate Judge "overlooked" the fact that defendant's "phone script for consumers that call requesting a free disclosure after an adverse action" does not allow consumers to request the report but rather directs them to defendant's website where they are required to "burn" their free annual disclosure.  (Doc. 150 at 48-49.)

Plaintiff has offered nothing to show that he requested a disclosure on the adverse action hotline.  His father testified that he called the number and did not receive the adverse-action disclosure.  However, he did not testify that the recording sent him to the website and he had to burn plaintiff's free annual disclosure.  Nothing in the record shows that plaintiff or his father went online to defendant's website.  In his Objection, plaintiff does not cite the

court to any evidence that plaintiff or his father were denied his adverse-action disclosure based on defendant's automated phone system sending them to defendant's website.

Therefore, any objections to the Magistrate Judge's Report and Recommendation based on issues with defendant's automated phone system are **OVERRULED**.

In support of its Motion for Summary Judgment, defendant presented evidence that plaintiff, or his father, had not requested an adverse-action disclosure and that it had no record of an adverse action against plaintiff from GE Money.  (Doc. 124 ¶¶ 19-20.)  Other than James Singletery's testimony that he called the 1-800 number and requested the adverse-action disclosure, (*see* doc. 127 at 171-73, 176, 184), nothing in the record supports an inference that defendant willfully failed to provide plaintiff an adverse-action disclosure.

Plaintiff's objections regarding the Magistrate Judge's Report and Recommendation that his claim based on the adverse-action disclosure be dismissed are **OVERRULED**.

Based on the foregoing, the Magistrate Judge's Report is **ADOPTED** and his Recommendation is **ACCEPTED**.  The court is of the opinion that there are no material facts in dispute and that defendant is entitled to judgment as a matter of law.  An Order granting defendant's Motion for Summary Judgment, (doc. 119), will be entered contemporaneously with this Memorandum Opinion.

## IV.  MOTION FOR CLASS CERTIFICATION

The Magistrate Judge reported that plaintiff had failed to meet the requirements of commonality and typicality for certifying a class.  (Doc. 149 at 37, 38.)  He also found that

plaintiff was not an adequate class representative, that common issues of fact or law did not predominate over individual issues, and a class action was not superior to individual actions. (*Id*. at 40, 41, 45.)  Based on plaintiff's failure to meet the Rule 23 requirements for a class action, he recommended that plaintiff's Motion for Class Certification be denied.  Plaintiff objects to these findings and the Magistrate Judge's Recommendation.  (*See* doc. 150 at 51-72.)

This court has carefully reviewed and considered de novo all the materials in the court file, including, but not limited to, the Report and Recommendation and plaintiff's objections. Based on its review, the plaintiff's objections to the Magistrate Judge's Report and Recommendation regarding his Motion for Class Certification are **OVERRULED**, the Magistrate Judge's Report is **ADOPTED** and his Recommendation that plaintiff's Motion for Class Certification should be denied is **ACCEPTED**.

An Order denying plaintiff's Motion for Class Certification, (doc. 94), will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 18th day of September, 2012.

SHARON LOVELACE BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE

28